United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DEVON CHRISTOPHER WENGER,<br>Defendant. | Case No. 23-cr-00268-JSW-2<br><br>**ORDER DENYING MOTION TO SUPPRESS AND SUPPLEMENTAL MOTION TO SUPPRESS**<br>Re: Dkt. Nos. 114, 130 |

Pending before the Court are two motions to suppress filed by Defendant Devon Wenger. Wenger seeks to suppress records seized from Wenger's cell phone, as well as statements made by Wenger in a March 23, 2022 interview. The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it finds the matter suitable for resolution without oral argument. *Cf.* Civ. L.R. 7-1(b). For the following reasons, the Court DENIES the motions.

## BACKGROUND

The United States alleges that Wenger violated 21 U.S.C. sections 846, 841(a)(1), and 841(b)(1)(E)(i) – Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids by conspiring with co-defendant Daniel Harris to deliver anabolic steroids to another officer identified as "B.M." (Dkt. No. 1, Indictment, Count One.) The United States further alleges that Wenger violated 18 U.S.C. section 1519 – Destruction, Alteration, and Falsification of Records in Federal Investigations by deleting messages from his cell phone relating to the alleged steroid conspiracy. (*Id.*, Count Four.)

Wenger was also charged in a related case with violations of 18 U.S.C. sections 241 and 242. *See United States v. Amiri et al*, 23-cr-269-JSW-3 (the "-269 Case").

Wenger denies the charges.

United States District Court
Northern District of California

**A.      The Challenged Warrants.**

In the pending motions, Wenger challenges four warrants: (1) the March 22, 2022 warrant issued by the Superior Court of Contra Costa County (the "State Court Warrant"); (2) the May 19, 2023 federal warrant (the "First Federal Warrant"); (3) the July 24, 2023 federal warrant (the "Second Federal Warrant"); and (4) a November 4, 2024 warrant (the "Third Federal Warrant"). All of the warrants authorized search of Wenger's personal cell phone data.

In its order denying Wenger's motions to suppress in the -269 Case, the Court described the State Court Warrant, First Federal Warrant, and Second Federal Warrant in detail. Because that opinion was limited to the -269 Case, the Court reproduces its prior summary as follows[1]:

**1.      The State Court Warrant.**

On March 22, 2022, a Senior Inspector with the Contra Costa District Attorney's Office, Larry Wallace, sought a warrant from a Contra Costa County Superior Court to search Wenger, his home, and his cell phone for "evidence, instrumentalities, contraband, or fruits of violations" of a number of state laws. (Dkt. No. 106, Declaration of Candice L. Fields ("Fields Decl."), Ex. 3, at DCW-000067-68 (the "State Court Warrant").)

In support of his warrant application, Wallace submitted an affidavit laying out the purported origins of the investigation into Wenger. He explained that the investigation originated with an investigation into Timothy Manly Williams for unrelated conduct and grew to cover multiple police officers with the Antioch and Pittsburgh Police Departments. (*Id.* at DCW-000071-72.) Wallace was assigned to investigate on September 21, 2021, following an anonymous letter to the Pittsburgh Police Department accusing Patrick Berhan and "[a] lot of other officers" of buying and selling illegal steroids. (*Id.* at DCW-000072.)

Special Agent Thuy Zoback, of the FBI, briefed Wallace on the FBI's parallel investigation into Antioch police officers. Zoback provided Wallace with messages between Antioch Police Officer Daniel Harris and Defendant which she believed indicated the sale and use of anabolic steroids. (*Id.* at DCW-000076.)

Wallace identified the following Venmo transactions which he believed could indicate payment for steroids: (1) an October 20, 2020 payment of $200 from Wenger to Harris for "reach arounds," and (2) an August 31, 2021 payment of $100 from Rombough to Wenger for "weapon stuff." (*Id.* at DCW-000076.)

Special Agent Kristin Templin provided Wallace with Wenger's address

---

[1] To avoid confusion, the Court modifies the formatting of the headings. All citations to the docket in this section are in reference to the -269 Case unless otherwise noted.

and cell phone information.  (*Id.*)  Wallace stated in the affidavit that the FBI had obtained the number via a subpoena and record check with Sprint.  (*Id.*)

The Contra [Costa] County Superior Court issued the State Court Warrant and authorized Wallace to search Wenger, his home, and his cell phone.  (*Id.* at DCW-000068.)  The State Court Warrant further authorized Wallace to obtain Wenger's fingerprint or facial image in order to unlock Wenger's phone with biometrics.  (*Id.* at DCW-000069.)

**2.      The First Federal Warrant.**

On May 19, 2023, Special Agent Munmeet Kular applied for a federal warrant to search Wenger's cell phone for evidence of excessive use of force and unlawful sale and possession of controlled substances.  (Fields Decl., Ex. 3, at DCW-000046-48 (the "First Federal Warrant").)  Kular noted that the cell phone was seized by the Contra Costa County District Attorney's Office and attached the State Court Warrant, but he stated that he was "not relying on either the existence of the state warrant or the results of any prior search to support probable cause for this warrant."  (*Id.* ¶ 10 [DCW-000050].)

**a.      Evidence of Excessive Force.**

To support his contention that probable cause existed to search Wenger's phone for evidence of excessive force in violation of 18 U.S.C. sections 241 and 242, Kular recounted text conversations between Wenger and Amiri located on previously obtained phone data from Amiri.

Kular quoted a text conversation between Amiri and Wenger on August 23 and 24, 2020, in which Amiri recounted his canine biting a suspect:

AMIRI:          bro we saw him laying in bed just acting like he was asleep. i walked out the tent and game planned how to [expletive] him up. went back and did justice. wish you were there. inside a tent with no cams… you would have loved it. oakley agreed to keep cameras off

WENGER:       Bro…[expletive] yes!!!  [Expletive] that nerd!!  That's what [expletive] happens when you run, you acquire a tax.  His tax was paid properly!  Good shit bro

AMIRI:          a very eventful work week 🤣 🤣

WENGER:       Hahahah [EXPLETIVE] YEAH BRO

AMIRI:          let's [expletive] some people up next work week

WENGER:       Bro

WENGER:       [Expletive] the [expletive] yes

WENGER:       Bite some nerds and crush some dweebs bro!

AMIRI:          hell yeah bro. ill find some shit.  ill write it. just come over and crush some skulls alongside purcy. ill handle the rest lol

(*Id.* ¶ 15 [DCW-000050-51].)  On October 8, 2020, Amiri wrote to a group chat about a suspect.  (*Id.* ¶ 22 [DCW-000053].)  Wenger responded, "Lets [sic] beat his [expletive] ass bro!  I'm down after work morty[.]"  (*Id.* ¶ 23.)  Wenger then messaged Amiri directly to say, "I'm serious bro, let's beat that dudes [sic] ass after work."  (*Id.*)  Later that evening, Amiri encountered the suspect, shoved him against a wall, and threatened to kill him.  (*Id.* ¶¶ 24-25 [DCW-000053-54].)

**b.     Evidence of Unlawful Possession and Distribution of Controlled Substances.**

To support his contention that probable cause existed to search Wenger's phone for evidence of possession and distribution of steroids in violation of 21 U.S.C. sections 841 and 846, Kular cited messages exchanged between Harris and Wenger.  (*Id.* ¶ 27 [DCW-000054].)  The messages were obtained from Harris's phone.  (*Id.* at DCW-000054 n.2)

On February 23, 2022, Wenger texted Harris to ask if he could "stop by today to pick up some shit!?"  (*Id.* ¶ 27.)  Kular believed Wenger was referring to steroids as "some shit."  (*Id.*)

On March 2, 2022, Wenger texted Harris to ask if he could "come by Monday or Sunday to pick up B.M.'s stuff."  (*Id.* ¶ 28 [DCW-000055].)  On March 9, 2022, Wenger texted Harris, "Calling to see if I can pick up B.M.'s stuff."  Harris responded with a picture of a USPS tracking label and stated, "It's late my dude!!"  (*Id.*)  Wenger responded, "[Expletive]! No worries. I'll give him my new one and take one of his, does that work?"  (*Id.*)  Harris then texted, "I think I have a bottle or 2 of sus. I can let you know! But just waiting in [sic] this damn order."  (*Id.*)

The image of the USPS tracking system reflected that a package was "in transit, arriving late."  (*Id.*)  Unbeknownst to Harris and Wenger, the FBI had seized the package pursuant to a warrant, and some of the bottles inside tested positive for testosterone enanthate.  (*Id.* ¶ 29 [DCW-000055-56].)

Kular also include Wenger's statements during a non-custodial interview that he had contracted COVID-19 in 2021 and took steroids to address resulting muscle weakness.  (*Id.* ¶ 30 [DCW-000056].)  Kular claimed Wenger admitted to purchasing steroids from Harris and using them for a few weeks in 2021.

\*\*\*

The court issued the warrant and authorized Kular to seize records relating to "the possession, use, purchase, sale, distribution, transfer, and/or concealment of controlled substances"; "[f]inancial, income, and/or transactional records, whether in electronic or physical record form, and communications about financial transactions; [r]ecords and communications concerning the potentially excessive use of force by police officers, including AMIRI, WENGER, and/or others"; and [r]ecords reflecting or relating to co-conspirators[.]"  (*Id.*, Attachment B [DCW-

United States District Court
Northern District of California

000064].)  The warrant further authorized Kular to seize evidence which showed the identity of the users or owners of the phone at the relevant times.  (*Id.*)

### 3.    The Second Federal Warrant.

On July 24, 2023, Kular obtained a second warrant to search Wenger's phone and seize evidence of the suspected violations of 18 U.S.C. sections 241 and 242 and 21 U.S.C. section 846.  (Dkt. No. 162-4, Application for Warrant (the "Second Federal Warrant").)

The Second Federal Warrant application was largely identical to the first, but it added three paragraphs to expand upon the allegations that Wenger unlawfully possessed testosterone enanthate.  The application clarified that Wenger had told FBI agents that he had searched for information about testosterone enanthate and found that it was exempt from regulation under Title 21 and so he "didn't think it was illegal."  (*Id.* ¶ 30.)  Kular explained that the DEA exempted testosterone enanthate if produced as a specific product by any one of six authorized manufacturers in a particular approved quantity.  (*Id.* ¶ 32 (citing 21 C.F.R. § 1308.33).)  The approved manufacturers were (1) Rugby Laboratories in Rockville, New York; (2) Forest Pharmaceuticals in St. Louis, Missouri; (3) Wintec Pharmaceutical in Pacific, Missouri; (4) Goldline Labs in Fort Lauderdale, Florida; (5) Schein Pharmaceuticals in Port Washington, New York; and (6) Steris Labs Inc. in Phoenix, Arizona.  (*Id.*)  The labels affixed to the bottles in the seized package ordered by Harris represented the bottles were from "Trueshot Pharmaceuticals" – an entity without an exemption.  (*Id.* ¶ 33.)

(-269 Case, Dkt. No. 180, Order Denying Motions to Suppress and Motion for *Franks* Hearing, at 2:1-5:23.)

### 4.    The Third Federal Warrant.

The Third Federal Warrant was issued after the Court's prior order.  (-268 Case, Dkt. No. 138-2, Third Federal Warrant.)  It authorizes search of Wenger's cell phone data for evidence of destruction, alteration, or falsification of records in violation of 18 U.S.C. section 1519.  Kular again provided the affidavit in support of the warrant.

Kular explained that Wenger's cell phone was seized pursuant to the State Court Warrant in 2022, and he stated that "[t]he FBI was also present at the execution of that state search warrant."  (*Id.* ¶ 7.)  Kular noted his prior searches pursuant to the first two federal warrants.  (*Id.* ¶ 11.)  All three prior warrants were attached as exhibits to Kular's affidavit.

Kular suspected that additional evidence of destruction, alteration, or falsification of records may be present in Wenger's data for two reasons.  First, Kular noticed that text messages

1    relating to steroids and including Wenger were present in Harris's data but were missing from

2    Wenger's data.  (*Id.* ¶¶ 12-14.)  These missing messages included a message in which Harris told

3    Wenger to "keep it hush" that he was "taking anything."  (*Id.* ¶ 14.)  Second, Kular found that the

4    Axiom and Cellebrite software had identified deleted messages between Wenger and B.M. in

5    which Wenger told B.M. that he would "pick up your stuff from Dan [Harris]" and in which B.M.

6    told Wenger, "LETS GET FUCKING JACKEEEEEEEEEED[.]"  (*Id.* ¶ 15.)  Kular also identified

7    messages between Wenger and his former romantic partner in which she inquired whether he was

8    using steroids, and Wenger denied use.  (*Id.* ¶ 16.)

9        The Magistrate Judge issued the warrant and authorized the investigators to examine

10   Wenger's data for, among other things, communications between Wenger and Harris and/or B.M.

11   that may have been deleted.  (*Id.*, Attachment B, ¶ 3.)

12       **5.      The March 23, 2022 Interview.**

13       State and federal agents jointly executed the State Court Warrant on March 23, 2022.  At

14   the execution of the warrant, Contra Costa County Senior District Attorney Investigator Darryl

15   Holcombe, Wenger, and FBI agents agreed to meet at the "Delta RV and Boat Storage" in Byron,

16   California, instead of Wenger's home.  (Dkt. No. 115-2, Declaration of Alethea Sargent ("Sargent

17   Decl."), Ex. 3, at US2-000723–US2-000724.)  Holcombe took Wenger's phone from the

18   cupholder in Wenger's car.  (*Id.*, Ex. 2, at DCW-4000088.)  Holcombe provided Wenger with his

19   work address and told Wenger he could come pick up his cell phone later that same day.  (*Id.* at

20   DCW-4000089.)

21        Special Agents Bill Leoni and Teak Wilson then provided Wenger with *Miranda* warnings

22   and briefly interviewed Wenger at the Delta RV and Boat Storage location.  (*Id.* at DCW-

23   4000093.)  Wilson asked Wenger how he got into using steroids, and Wenger answered that he

24   started taking hormones after contracting COVID-19.  (*Id.* at DCW-4000096.)  Leoni asked

25   Wenger if he was willing to cooperate or offer other information, and Wenger declined and

26   terminated the interview.  (*Id.* at DCW-4000098 – DCW-4000100.)

27       Later the same day, Wenger went to the police station to retrieve his phone and agreed to

28   speak with FBI Special Agents Templin and Zoback.  (Sargent Decl., Ex. 5.)  Templin repeated

United States District Court
Northern District of California

6

the *Miranda* warnings and reminded Wenger that he was free to change his mind and leave at any time. (*Id.* at DCW-4000005.)  During the interview, Wenger stated that he suffered from COVID-19 at the end of 2021 and lost his muscle mass and hormones. (*Id.* at DCW-4000021.)  Wenger stated that he contacted Dan Harris for advice, and that Harris recommended testosterone. (*Id.* at DCW-4000022.)  Wenger stated that he obtained the testosterone from Harris rather than a doctor to avoid wait times, but he believed the substances were legal. (*Id.* at DCW-4000023 – DCW4000024.)

Wenger now seeks to suppress statements made in the interview, as well as the products of all four challenged search warrants.

## ANALYSIS

### A.  Legal Standards Applicable to a Motion to Suppress.

A defendant challenging a warrant as constitutionally infirm must show (1) the warrant was invalid under the Fourth Amendment, or (2) an otherwise valid warrant was "executed in a manner that rendered the searches unreasonable." *United States v. Artis*, 919 F.3d 1123, 1128 (9th Cir. 2019).

A search warrant satisfies the Fourth Amendment if it is (1) issued by a "neutral, disinterested" magistrate judge; (2) supported by an application that demonstrates probable cause that "the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and (3) describes with particularity the place to be searched and the things to be seized. *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal marks omitted).

Probable cause supports a search warrant if there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "This standard does not require the affidavit to establish that the evidence is in fact in the place to be searched, or even that it is more likely than not to be there.  Rather, the issuing judge need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Elmore*, 917 F.3d 1068, 1074 (9th Cir. 2019) (internal citations and quotations omitted).  "All data necessary to show probable cause" "must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde*, 440 F.3d 1065,

1    1067 (9th Cir. 2006) (en banc) (quotation and citation omitted). A finding of probable cause does

2    not authorize a general search for evidence of any crime. "The scope of a warrant must be limited

3    by its probable cause and must 'never include more than is covered' by that probable cause."

4    *United States v. King*, 985 F.3d 702, 707 (9th Cir. 2021) (quoting *United States v. Whitney*, 633

5    F.2d 902, 907 (9th Cir. 1980)) (internal citations omitted).

6        Whether probable cause exists is a "commonsense, practical question" which is "not

7    readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 230, 232.

8    Reviewing courts pay "great deference" to the Magistrate Judge's determination of probable

9    cause. *Id.* at 236. So long as the issuing judge had a "substantial basis for concluding that a

10    search would uncover evidence of wrongdoing," the probable cause determination will be

11    affirmed. *Id.* (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)) (internal marks omitted).

12        If the defendant proves that challenged evidence was unlawfully obtained, he faces an

13    additional hurdle to exclude the evidence from use at trial. *Davis v. United States*, 564 U.S. 229,

14    231-32 (2011). In light of the "high cost to both the truth and the public safety," suppression is

15    only appropriate if it could deter future police misconduct in similar circumstances. *Id.* at 232.

16    Suppression is not appropriate if the evidence is "obtained as a result of nonculpable, innocent

17    police conduct." *Id.* at 240. The defendant must demonstrate that either (1) the officer who

18    obtained the warrant was dishonest or reckless in presenting information to the issuing court, or

19    (2) the warrant was so clearly deficient that the officer "could not have harbored an objectively

20    reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926

21    (1984).

22    **B.    The State Court Warrant Was Defective in Part, but Suppression Is Unwarranted.**

23        Wenger argues that the State Court Warrant lacks probable cause and violates Federal Rule

24    of Criminal Procedure 41(b). Wenger contends that the Court must consider the validity of the

25    State Court Warrant because here, unlike in the -269 Case, the Government intends to introduce

26    evidence from the federal warrants at trial, and the defects in the State Court Warrant taint the

27    federal warrants. Further, here, unlike in the -269 Case, Wenger challenges the admissibility of

28    statements made during his March 23, 2022 interview with the FBI. The interview took place on

United States District Court
Northern District of California

8

1  the same day as the execution of the State Court Warrant, raising the possibility that if the State

2  Court Warrant is invalid, then the interview constitutes fruit of the poisonous tree.

3        **1.**     **The State Court Warrant Was Not Supported by Probable Cause that**

4                 **Evidence of Possession of Anabolic Steroids with Intent to Distribute Would Be Found in Wenger's Cell Phone Data.**

5        The State Court Warrant was supported by probable cause that evidence of possession of

6  anabolic steroids would be found on Wenger's phone—but not evidence of possession for sale.

7        The State Court Warrant authorized a search for evidence of violations of 21 U.S.C.

8  section 846.  Section 846 prohibits attempting to or conspiring to commit any offense defined in

9  the subchapter.  Possessing and possessing with intent to distribute controlled substances,

10  including anabolic steroids, are prohibited by the subchapter.  21 U.S.C. §§ 841, 844.

11        In the affidavit, Wallace asserts that he "believes Officer Devon C. Wenger, APD, has

12  been and is currently purchasing illegal controlled Schedule III anabolic steroids from Officer

13  Daniel Harris, APD."  (State Court Warrant, at DCW-000076.)  Wallace's affidavit includes

14  messages between Harris and Wenger which support the conclusion that Wenger obtained

15  anabolic steroids from Harris.  (*See id.* at DCW-000076-77 (Wenger texting, "I need some test or

16  growth shit in my life" and "I have more energy, less recovery time between sets and just feel

17  fucking juicy bro"; Harris texting, "Welcome to the anabolic club!" and "I'd keep it hush you are

18  taking anything.").)  The State Court Warrant also includes the results of a federal search into a

19  package sent to Harris under an alias for twenty-one bottles of liquid steroids and one package of

20  steroid capsules.  (*Id.* at DCW-000078.)

21        The State Court Warrant does not connect Wenger to the package.  Nor does it contain any

22  messages between Harris and Wenger in which Wenger agreed to distribute controlled substances.

23  Although the FBI had Harris and Wenger's messages regarding steroids for B.M. in its possession,

24  Wallace did not include those messages in his affidavit.  The only evidence contained in the

25  affidavit relating to both steroids and Wenger are the messages in which Wenger allegedly seeks

26  steroids from Harris and then discusses his personal use.  Thus, to find probable cause as to

27  possession for sale or conspiracy to distribute the steroids, the Court must draw an inference that

28  Wenger distributed the steroids solely from evidence of Wenger's personal use.  This is too great a

United States District Court
Northern District of California

1  ley.[2]  *See United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) (finding search warrant

2  deficient where affidavit did not connect general conclusions about nature of the crime to

3  individual whose home was to be searched).

4     **2.   The State Court Warrant Was Supported by Probable Cause that Evidence of
           Violation of California Penal Code Section 182(a)(5) Could Be Found on
5           Wenger's Cell Phone.**

6     The State Court Warrant authorized searches relating to anabolic steroids via citations to

7  California Penal Code section 182(a)(5).  Section 182(a)(5) prohibits conspiracy to commit "any

8  act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due

9  administration of the laws."  The Government argues—and Wenger does not refute—that the

10  statute includes "conspiracy with or among public officials not to perform their official duty to

11  enforce criminal laws."  (Dkt. No. 116, Opp., at 11:10-11 (quoting *Lorenson v. Sup. Ct. in & for

12  Los Angeles Cnty.*, 35 Cal.3d 49, 59-60 (1950)).)

13     A conspiracy between two police officers charged with upholding the law to possess or sell

14  controlled substances and to conceal that conspiracy falls within this category.  The State Court

15  Warrant included communications between Harris and Wenger in which they apparently agree to

16  conceal Wenger's use of steroids from the police department.  (*See* State Court Warrant, at DCW-

17  000077-78 (agreeing to "keep it hush" so that Wenger's steroid use does not "get[] to some people

18  at the PD [police department].").)  Because conspiracy necessarily includes communications, and

19  because the State Court Warrant demonstrated communications between Harris and Wenger on the

20  subject, the issuing judge had a substantial basis to believe that additional evidence of conspiracy

21  to violate Section 182(a)(5) could be found in Wenger's cell phone data.

22

23

24  [2] Wenger also argues that the State Court Warrant lacks probable cause because possession of
    anabolic steroids is not a felony under the California code sections cited in the warrant.  The
25  California code sections relate solely to narcotics.  This argument ignores the citation to 21 U.S.C.
    section 846.  Moreover, no evidence in the affidavit relates to possession or sale of narcotics; it is
26  clear that the officers intended to search for violations of law relating to the possession and sale of
    anabolic steroids.  The parties do not contend that any evidence relating to narcotics was pursued
27  or uncovered.  The mis-citation does not impact Wenger's rights.  *See Gates*, 462 U.S. at 235-36
    (explaining that search warrants are often sought and obtained by lay persons, not attorneys, and
28  thus require "a standard less demanding than those used in more formal legal proceedings").

United States District Court
Northern District of California

**3.      Suppression Is Not Warranted Under Rule 41(b).**

Wenger next argues that the State Court Warrant fails under Rule 41(b) because the court authorized a search for violation of 21 U.S.C. section 846, a federal statute.  Wenger contends that the Superior Court had no authority under Rule 41(b) to issue a warrant for a federal crime at a state law enforcement officer's request and without a showing that a magistrate judge was unavailable.

Rule 41(b) authorizes "a federal law enforcement officer or an attorney for the government" to seek a warrant from "a magistrate judge with authority in the district – or if none is reasonably available, a judge of a state court of record in the district."  Fed. R. Crim. P. 41(b)(1).  State law enforcement officers must follow the Federal Rules of Criminal Procedure only if the search is "federal in character."  *Martinez-Garcia*, 397 F.3d at 1213 (quoting *United States v. Palmer*, 3 F.3d 300, 303 (9th Cir. 1993)).  "Generally, a search is federal if from the beginning it was assumed a federal prosecution would result."  *Palmer*, 3 F.3d at 303.  "A federal officer's 'mere participation' in a search does not make it a federal one."  *Id.* (quoting *Byars v. United States*, 273 U.S. 28, 30 (1927)).  "Mere participation" encompasses a relatively wide range of conduct: in *Palmer*, a federal law enforcement agent informed state authorities that he would pursue a federal prosecution if a certain amount of contraband was recovered; the federal agent accompanied the state authorities during the search; and the federal agent "removed, examined and obtained a sample of the [contraband] during the execution of the state search warrant."  *Id.* at 302. Because the investigation was "initiated and controlled by the local law enforcement officials," the federal agent's participation did not change the character of the investigation.  *Id.*  On the other hand, federal authorities do more than merely participate if they "enlist[] the assistance of local officials in a pending investigation and the local officials later initiat[e] their own investigation with the help of the federal agent."  *Id.* at 303.

Here, state authorities initiated the investigation into Antioch and Pittsburgh police officers.  (State Court Warrant, at DCW-000072.)  The Antioch Police Department contacted Special Agent Zoback in 2021 to request assistance after learning that Officer Timothy Manly Williams ("Manly") had placed a phone call to the subject of a wiretap ahead of the execution of a

11

search warrant.  (*Id.*)  Later that year, the Pittsburgh Police Department contacted the Contra Costa County District Attorney's Office to commence an investigation after receipt of an anonymous note stating that Pittsburgh Officer Patrick Berhan was buying and selling steroids, and that "[a] lot of other officers are involved locally."  (*Id.*)

Additionally, the violations of law contemplated by the State Court Warrant were mostly state in nature.  The warrant authorized search relating to violations of seven laws, only one of which was federal.  (*Id.* at DCW-000068.)  The State Court Warrant contemplated potential state action, and the Contra Costa District Attorney's Office did in fact prosecute Antioch and Pittsburgh police officers with alleged crimes uncovered in the course of its investigation.

Federal involvement in the State Court Warrant was not substantial enough to transform the state investigation into a federal one.  Zoback uncovered evidence from searches into Manly's data that Daniel Harris had sold anabolic steroids to Manly.  (*Id.* at DCW-000073.)  From there, Zoback provided Wallace with the messages from Harris's iCloud data which Wallace ultimately included in his affidavit in support of the State Court Warrant.  (*Id.* at DCW-000076, -000078.)  FBI agents assisted in the execution of the State Court Warrant, including by contacting Wenger by phone to let him know that they were outside his house with a search warrant.  Although Wenger initially provided his phone to DAI Holcombe, the FBI conducted a search of the phone that same morning to determine whether messages were set to automatically disappear.  (Dkt. No. 130-1, Decl. of Dena Marie Young, Ex. F.)

The Court finds that the search was not federal in nature.  Like in *Palmer*, the investigation was initiated by state authorities who contacted federal agents for assistance.  *See Palmer*, 3 F.3d at 303.  Nevertheless, the warrant was produced by state authorities in the course of investigation into primarily state crimes.  Also as in *Palmer*, federal agents were present and examined evidence at the execution of the search warrant, but "mere participation" in the execution of a warrant does not turn a state search into a federal one.  *See id.*  Accordingly, the state authorities were not required to follow Federal Rule of Criminal Procedure 41(b).

Moreover, Wenger has not demonstrated that suppression would be an appropriate remedy for Rule 41 violations.  Violations of Rule 41 merit suppression if: "1) the violation rises to a

United States District Court
Northern District of California

'constitutional magnitude;" 2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule; or 3) officers acted in 'intentional and deliberate disregard' of a provision in the Rule." *United States v. Martinez-Garcia*, 397 F.3d 1205, 1213 (9th Cir. 2005) (quoting *United States v. Crawford*, 657 F.2d 1041, 1047 (9th Cir. 1981)).  There was no prejudice here; Wenger acknowledges "the government could theoretically have sought a federal search warrant, using only information from the Harris phone which it had previously seized."  (Mot. to Suppress, at 6:14-15.)  There is therefore no indication that "the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule."  *Martinez-Garcia*, 397 F.3d at 1213.

### 4. The March 23, 2022 Interview Is Admissible.

Wenger's arguments as to the lawfulness of his March 23, 2022 interview with the FBI rise and fall with the validity of the State Court Warrant.  He makes no independent arguments as to defects in the interview.  The Court understands Wenger's argument to be that the authorities first unlawfully seized his cell phone, then used his cell phone as "bait" to convince Wenger to participate in the interview with federal agents.

Although the State Court Warrant was not supported by probable cause as to possession for sale of narcotics or steroids, the State Court Warrant included sufficient probable cause to search Wenger's cell phone for evidence of other violations, including violation of California Penal Code section 182(a)(5).  Because law enforcement officials could search Wenger's cell phone even if certain portions of the State Court Warrant were excised, DAI Holcombe lawfully obtained the phone from Wenger.  Wenger's visit to the police station and interview with the FBI agents did not therefore stem from any illegality in the State Court Warrant.  *See United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (noting "[t]he exclusionary rule requires a causal connection between the illegal conduct and the evidence sought to be suppressed.").

Further, even if the interview and the defects in the State Court Warrant were connected, Wenger's statements should not be suppressed because the FBI agents did not confront Wenger with any illegally obtained evidence.  *See id.* at 1058 (explaining fruitless search could not have caused later confession); *United States v. Parkins*, 92 F.4th 882, 894 (9th Cir. 2024) (holding

United States District Court
Northern District of California

statements were not product of unlawful search "because the officers did not confront Parkins with the evidence obtained as a result of that search.")  The Government notes that the FBI agents brought up that they had "read some chats" and "text messages," but contends that those messages refer to "chats" found in Harris's phone.  (Dkt. No. 116, Opp., at 15-16.)  Wenger does not dispute this point or contend that the FBI agents were instead referring to messages observed on Wenger's phone during the initial search to determine whether Wenger's messages were set to automatically delete.  Accordingly, suppression is not warranted.

**C.     Defects in the State Court Warrant Do Not Warrant Suppression of the Fruits of the Federal Warrants.**

In the -269 Case, the Court held that defects in the State Court Warrant do not taint the federal warrants because the defects in the State Court Warrant were not relevant to the Magistrate Judge's determination of probable cause.  In so holding, the Court relied on *United States v. Romero*, 585 F.2d 391, 395 (9th Cir. 1978).

In *Romero*, state authorities seized documents pursuant to a state court warrant which was later suppressed in its entirety.  *Id.* at 394.  The FBI subsequently obtained a search warrant for the office of the state prosecutor to seize the evidence which had been illegally seized by the state authorities.  *Id.*  The Ninth Circuit noted that "[t]he federal warrants were supported by affidavits which contained no significant information which was not available to the FBI prior to the issuance and execution of the state warrants."  *Id.*  Because the warrant was supported by "untainted evidence independently gathered and unrelated to the illegal state warrant and seizure thereunder," suppression was not appropriate.  *Id.* at 397.

Wenger contends that the Court erred.  He argues *Romero* does not apply to this case because the State Court Warrant was "federal in nature," and thus the evidence used in the warrant affidavits were not independent of the state search.  As explained above, the Court finds that the State Court Warrant and its execution were not federal in nature.

More importantly, the federal warrants did not rely on any fruits of the State Court Warrant.  Kular used messages obtained from Harris and Amiri's cell phone data to demonstrate probable cause in the First and Second Federal Warrants.  Those messages did not result from the

14

state search into Wenger's phone, and indeed the Harris messages preceded and were cited in Wallace's affidavit in support of the State Court Warrant.

Kular also cited to Wenger's statements in the March 23, 2022 interview in the First and Second Federal Warrants. This citation comprises of one short paragraph, the absence of which would not impact the probable cause analysis. (Second Federal Warrant, ¶ 30, at DCW-000823; First Federal Warrant, ¶ 30, at DCW-000865.) Further, as discussed above, the Court finds that Wenger's statements did not result from any illegality in the State Court Warrant. This passing citation to a lawful interview does not taint the federal warrants.

*Romero*, therefore, squarely governs this case. Just as in *Romero*, Kular's affidavits do not contain any significant information which was not available to the FBI without the state search into Wenger's phone. 585 F.2d at 394. Instead, Kular demonstrated probable cause with information independently gathered and lawfully obtained. The state search has no bearing on the legality of the subsequent federal searches.

Because Wenger's argument as to the validity of the First and Second Federal Warrants is based entirely on the defects in the State Court Warrants, the Court finds the First and Second Federal Warrants are valid.

**D.      The Third Federal Warrant Is Valid.**

In his supplemental suppression motion, Wenger argues that the Third Federal Warrant is invalid because it (i) contains material falsities or omissions of fact, and (ii) is overbroad.

**1.      The Third Federal Warrant Is Supported by Probable Cause.**

The Third Federal Warrant authorizes search of Wenger's cell phone, the forensic image of which was already in the FBI's possession. (Third Federal Warrant, Attachment A, at DCW-000807.) The warrant authorizes seizure of "[a]ll records from the Target Data described in Attachment A from the time period of November 1, 2021, to March 23, 2022 that relate to violations of 18 U.S.C. § 1519 (destruction, alteration, or falsification of records)[.]" (*Id.*, Attachment B, ¶ 1, at DCW-000808.)

The Magistrate Judge had a substantial basis to believe that evidence of violation of Section 1519 could be found in Wenger's phone data. Kular's affidavit explained that text

1  messages relating to steroids and including Wenger were present in Harris's data but were missing

2  from Wenger's data.  (Third Federal Warrant, ¶¶ 12-14.)  These missing messages included a

3  message in which Harris told Wenger to "keep it hush" that he was "taking anything."  (*Id.* ¶ 14.)

4  Additionally, Kular explained that the Axiom and Cellebrite software had identified deleted

5  messages between Wenger and B.M. in which Wenger told B.M. that he would "pick up your stuff

6  from Dan [Harris]" and in which B.M. told Wenger, "LETS GET FUCKING

7  JACKEEEEEEEEEED[.]"  (*Id.* ¶ 15.)  Kular averred that the Axiom and Cellebrite software could

8  process additional information from Wenger's data which might reveal more evidence of deleted

9  records.  (*Id.* ¶ 20.)  These missing, known messages provide probable cause to search for further

10  evidence of deletions or alterations.  *See Elmore*, 917 F.3d at 1074 (explaining "the issuing judge

11  need only conclude that it would be reasonable to seek the evidence in the place indicated in the

12  affidavit.").

13         **2.        Wenger Does Not Identify Material Falsities or Omissions of Fact.**

14         Wenger contends that the Third Federal Warrant presented false assertions to and material

15  omissions from the Magistrate Judge which negate probable cause.  Most of Wenger's arguments

16  are made without regard to the text of or supporting documentation for the Third Federal Warrant.

17         Among these misstatements, according to Wenger, is "the false assertion that [Wenger's]

18  phone was initially seized pursuant to a state warrant."  (Dkt. No. 130, Supplemental Motion to

19  Suppress, at 2:24-25.)  Wenger contends this statement is false because FBI officers assisted in

20  executing the State Court Warrant and stored the phone in FBI custody for approximately two

21  weeks thereafter.  As discussed above, the Court finds the State Court Warrant was not federal in

22  nature.  Wenger's cell phone was in fact initially seized pursuant to a state warrant.

23         Wenger next argues the Government omitted discussion about the validity of the State

24  Court Warrant.  This argument is unfounded.  The Third Federal Warrant both includes the State

25  Court Warrant as an attachment and informs the Magistrate Judge that a motion to suppress the

26  State Court Warrant was pending at the time of the application.  (Third Federal Warrant, at DCW-

27  000799 n.2; *id.* at DCW-000876.)

28         Wenger further contends that the Government did not include discussion of whether earlier

16

United States District Court
Northern District of California

1    searches of the device had yielded relevant evidence.  This argument, too, is unfounded.  The

2    Third Federal Warrant describes messages seized during execution of the previous federal

3    warrants, and it explains that prior searches of Wenger's phone data revealed that messages

4    present in Harris's phone were missing from Wenger's phone.  (*Id.* at ¶¶ 12-16.)  It is difficult to

5    square Wenger's argument that the previous searches did not yield evidence with Kular's affidavit

6    which relies on that evidence.

7          Wenger next argues that warrants must not rely on stale information and that almost two

8    years passed between the seizure of the phone and the application for the Third Federal Warrant.

9    He does not explain how the staleness principle applies to this case nor how the Government could

10   have misrepresented the age of the information.  The Government in fact discloses the timeline of

11   previous warrants, including the initial seizure pursuant to the State Court Warrant.  (*Id.* ¶¶ 7-10.)

12         Wenger argues that Kular should have included discussion regarding whether the text

13   messages he cites were personal or commercial in nature.  He provides no authority for the

14   position that the Government needed to distinguish commercial and personal messages, and he

15   does not explain how such an omission impacts the probable cause analysis.  Kular relayed texts

16   regarding steroids and explained that additional messages appeared to have been deleted; whether

17   those messages were commercial or personal in nature is irrelevant.

18         Wenger next contends, without citation to the record, that the Third Federal Warrant does

19   not address the reliability or bias of the information in the affidavit.  Not so.  Kular attested that he

20   personally reviewed the relevant messages; he provided information regarding his background and

21   training; and he explained the source of the messages.  (*See id.* ¶¶ 3, 11.)

22         Wenger next argues that the Government did not acknowledge potentially exculpatory

23   evidence in the application.  He does not point to any particular exculpatory evidence which was

24   omitted or otherwise support this argument with citations to the record.  Without more, this

25   argument is waived.  *Cf. United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments

26   made in passing and not supported by citations to the record or to case authority are generally

27   deemed waived.").

28         Wenger's penultimate misrepresentation argument is that the affidavit does not state

United States District Court
Northern District of California

whether Wenger shared his cell phone with other individuals.  The Court is unaware of authority which provides that a warrant affidavit must establish that only one person used a target electronic device.[3]  The affidavit, however, contains sufficient information to link Wenger to the phone. Kular attested that Wenger provided his phone to DAI Holcombe.  (Third Federal Warrant, at ¶ 7.) Kular further provided messages regarding steroids between B.M. and Wenger found in the phone data, which B.M. corroborated by testifying that he communicated with Wenger regarding steroids.  (*Id.* ¶ 15.)

Finally, Wenger contends that the Government misled the Magistrate Judge by failing to discuss plausible innocent explanations for deletions, "such as routine device management." (Supplemental Motion to Suppress, at 6:15-16.)  This argument misses the mark.  The Government was not required to speculate as to potential innocent explanations for the absence of known messages from Wenger's phone.  Instead, the Government reasonably inferred that Wenger may have selectively deleted messages by the pattern of deletions from three different conversations.  *See United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991) (holding that defendant's proffered innocent explanation for each activity did not negate suspicion when activities considered as part of pattern).  As the Ninth Circuit has explained, "the omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the search."  *United States v. Craighead*, 539 F.3d 1073, 1081 (9th Cir. 2008); *see id.* (holding affiant did not need to include "IP spoofing, internet hijacking, and internet theory" in affidavit stating belief evidence originated on defendant's computer).  Here, Kular observed missing messages relating to steroid use between Wenger and Harris, B.M., and Wenger's former romantic partner.  When considered together and with Kular's expertise, the Magistrate Judge had a substantial basis to conclude that Wenger may have deleted the messages in order to conceal wrongdoing and obstruct a federal investigation in violation of 18 U.S.C. section 1519.

---

[3] Wenger cites *United States v. Reeves*, 210 F.3d 1041 (9th Cir. 2000) for the proposition that "failure to establish exclusive control of a device undermines a warrant's validity."  (Supplemental Mot. to Suppress, at 6:12-13.)  *Reeves* does not address the question of exclusive possession.

Altogether, Wenger does not identify any misrepresentations or omissions, much less misrepresentations or omissions which were made intentionally or recklessly.

### 3. The Third Federal Warrant Is Sufficiently Specific.

Wenger next contends that the warrant is invalid because it lacks specificity. To be sufficiently specific, a search warrant must have appropriate particularity and breadth. *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quoting *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993)). Wenger argues both are missing here.

### a. The Warrant Stated the Scope with Particularity.

Wenger contends that the Third Federal Warrant lacks particularity because it authorizes the seizure of "all records" and "all communications" from Wenger's cell phone, without limiting the seizure to evidence relevant to the alleged criminal offenses.

This contention clashes with the record before the Court. The warrant authorizes seizure of "All records from the Target Data. . . from the time period of November 1, 2021, to March 23, 2022 that relate to violations of 18 U.S.C. § 1519 (destruction, alteration, or falsification of records)[.]" (Third Federal Warrant, Attachment B, at ¶ 1.) The warrant then sets forth eight specific categories of records subject to seizure. (*Id.* ¶¶ 2-9.) This is the exact limiting language which Wenger claims is necessary.

A search warrant is sufficiently particular if it "sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not," provided the government was not "able to describe the items more particularly in light of the information available to it at the time the warrant was issued." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). Even if the warrant seeks generic categories of evidence, "[r]eference to a specific illegal act can, in appropriate cases, provide substantive guidance for the officer's exercise of discretion in executing the warrant." *Id.* at 964.

The Third Federal Warrant cabins the seizures and provides sufficient guidance to law enforcement by limiting seizures to evidence relevant to the suspected criminal conduct. *See*

United States District Court
Northern District of California

1   *Cardwell*, 680 F.2d at 77 (noting preambulatory statement may have cured otherwise overly

2   general categories).  The Government could not reasonably have defined the categories of seizure

3   with more particularity given the likely presence of responsive records in Wenger's

4   communications, notes, or files.  *Cf. United States v. Schesso*, 730 F.3d 1040, 1046 (9th Cir. 2013)

5   (approving breadth of warrant for electronic data where "[t]he government was faced with the

6   challenge of searching for digital data that was not limited to a specific, known file or set of

7   files.").

8                    **b.      The Warrant Is Not Overbroad.**

9              Wenger contends that the Third Federal Warrant is temporally overbroad because Kular

10  did not establish a nexus between the entire timeframe and the alleged criminal conduct.  The

11  Government responds that no time limitation is required, but that nevertheless the timeframe is

12  "modest," supported by the attachments to Kular's affidavit, and necessary to understand context.

13  (Opp. to Supp. Mot. to Suppress, at 14:19.)

14             Time limitations bear on breadth, but the absence of a limitation does not render a warrant

15  facially overbroad.  *United States v. Martinez*, No. 19-cr-00662-JSW-1, 2020 WL 3050767, at *6

16  (N.D. Cal. Jun. 8, 2020).  The Ninth Circuit has upheld warrants for seizure without time

17  limitations where the records to be seized likely relate to the activities "within the scope of the

18  probable cause underlying the warrant."  *United States v. Gomez-Soto*, 723 F.2d 649, 653 (9th Cir.

19  1984).

20             Here, the temporal scope of the warrant is supported by probable cause.  Kular's affidavit

21  demonstrated probable cause that relevant messages could be found in Wenger's data from the

22  early months of 2022.  Kular attached the prior warrants, which included Wenger's March 23,

23  2022 statement that he used steroids in 2021.  The Third Federal Warrant authorized seizure of

24  records only from the last few months of 2021 and beginning of 2022.  This brief slice of time is

25  not overly intrusive and provides context for the 2022 messages.

26             Wenger next argues that the Third Federal Warrant is overbroad because it does not

27  include safeguards to exclude privileged or irrelevant data.  The absence of discussion of those

28

United States District Court
Northern District of California

1    issues, he contends, violates his protected privacy interests.[4]  The Government responds that initial

2    over-seizure and omission of Wenger's preferred electronic search protocol does not render the

3    warrant invalid.

4            The attorney-client privilege is a rule of evidence, not a constitutional right.  *Clutchette v.*

5    *Rushen*, 770 F.2d 1469, 1471 (9th Cir. 1985).  Nevertheless, government intrusion into the

6    attorney-client relationship may violate the defendant's Sixth Amendment rights if it

7    "substantially prejudices the defendant."  *Id.*  The burden to prove privilege lies with the party

8    claiming privilege.  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009).  The party

9    claiming privilege must demonstrate the existence of an attorney-client relationship and the

10   privileged nature of an improperly seized communication.  *Id.*

11           Here, Wenger has not identified any privileged communications which were present in his

12   phone data and which the Government may have reviewed or seized.  Nor has Wenger

13   demonstrated any prejudice which may have resulted from the Government's hypothetical seizure

14   of privileged communications.  Given Wenger's burden to prove both privilege and prejudice, this

15   argument fails.  *See id.* at 609 (holding defendant's claim of privilege, made without particularity,

16   could not support suppression order); *see also United States v. SDI Future Health, Inc.*, 464 F.

17   Supp. 2d 1027, 1039 (D. Nev. 2006) (noting no authority requires government to employ taint

18   team to review potentially privileged records at outset of search).

19           Wenger's argument as to over-seizure of irrelevant data likewise fails.  Probable cause

20   must support seizure of all evidence of the particular type described in the warrant.  *Spilotro*, 800

21   F.2d at 963.  However, the Ninth Circuit has recognized that "[o]ver-seizing is an accepted reality

22   in electronic searching because there is no way to be sure exactly what an electronic file contains

23   without somehow examining its contents."  *United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir.

---

[4] In support of this point, Wenger cites *United States v. DeMassa*, 748 F.2d 674, 676 (9th Cir. 1984).  The Court was unable to locate this authority, as 748 F.2d 674 corresponds to *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*  Through additional searching, the Court located *DeMassa v. Nunez*, 747 F.2d 1283 (9th Cir. 1984), which involved search and seizure of records held by a law firm.  *Id.* at 1285.  The panel dismissed the appeal for lack of jurisdiction without reaching the merits.  *Id.* at 1286.  Even if the panel had reached the merits in *DeMassa*, searches of records held by law firms raise privilege issues which are not present here.

United States District Court
Northern District of California

2015) (quoting *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) ("*CDT*")) (internal marks omitted).  Thus, a two-step seizure in which law enforcement first scoops up large quantities of data and then segregates responsive data is lawful.  *CDT*, 621 F.3d at 1177.  The warrant need not provide a narrow search protocol if the Government cannot identify the name and location of files to be seized with greater particularity.  *See United States v. Schesso*, 730 F.3d 1040, 1046 (9th Cir. 2013) (approving broad review of digital devices where "government had no way of knowing which or how many illicit files there might be or where they might be stored, or of describing the items to be seized in a more precise manner").  The Third Federal Warrant complied with this standard by acknowledging the potential for evidence which may appear "facially legitimate," (Third Federal Warrant, ¶ 21), and providing for specific categories of items to be seized.

## CONCLUSION

For the foregoing reasons, Defendant Devon Wenger's motions to suppress are DENIED.

**IT IS SO ORDERED.**

Dated: January 17, 2025

_____
JEFFREY S. WHITE
United States District Judge