UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEVON CHRISTOPHER WENGER,

Defendant.

Case No. 23-cr-00268-JSW-2

**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL OR FOR NEW TRIAL**

Re: Dkt. No. 217

Now before the Court is Defendant Devon Wenger's motion for a judgment of acquittal or, in the alternative, motion for new trial. The Court has considered the parties' papers, relevant legal authority, the record in this case, and oral argument. For the following reasons, the Court DENIES Defendant's motion.

## BACKGROUND

The Government charged Defendant with Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids in violation of 21 U.S.C. sections 846, 841(a)(1) and (b)(1)(E)(i) and Destruction, Alteration, and Falsification of Records in Federal Investigations in violation of 18 U.S.C. section 1519. (Dkt. No. 1, Indictment.) Defendant was convicted on both charges after a jury trial. (Dkt. No. 207, Jury Verdict.)

### A.    Evidence Presented at Trial.

At trial, the Government called nine witnesses, and the defense called none:

#### 1.    Inspector Sukhdeep Singh

Inspector Singh testified that he is a postal inspector with the United States Postal Inspection Service ("USPIS"). (Dkt. No. 219, Trial Tr., Vol. I, at 204.) On March 1, 2022, Inspector Singh seized and searched a medium flat-rate priority box addressed to a "Danny

Moore" in Discovery Bay, California from a sending address in Florida.  (*Id.* at 207-09.)

Inside the package, Inspector Singh located two small flat-rate priority boxes, also addressed to Danny Moore in Discovery Bay.  (*Id.* at 210.)  One of the smaller boxes in turn contained black pouches with prescription medications, labeled "True Shot Pharmaceuticals." (*Id.*)  Inspector Singh's investigation revealed that True Shot Pharmaceuticals was a fictitious name, not linked to a legitimate pharmacy.  (*Id.* at 211.)  The other small box contained glass vials with three different colors of caps, which Inspector Singh suspected to be Schedule III anabolic steroids.  (*Id.*)

Inspector Singh documented the search by photographing the package and each of the items inside.  (*Id.* at 212.)  The items were then placed in clear evidence bags, weighed, assigned USPIS evidence bar codes, and marked with the date, weight, and searcher's initials.  (*Id.*)

On the stand, Inspector Singh authenticated the physical package and its contents.  (*Id.* at 212-217 (authenticating Exhibit 16 (medium flat-rate box with two small flat-rate boxes); Exhibit 3 (clear bag containing glass vials with gray caps); Exhibit 5 (clear bag containing glass vials with lavender caps); Exhibit 7 (clear bag containing glass vials with red caps); and Exhibit 1 (black pouch containing Anadrol pills)).)

On cross-examination, Inspector Singh testified that he reviewed an electronic report which documented online inquiries into the status of the package.  (*Id.* at 219-221.)  The report indicated inquiries from around the world, but no inquiries from Northern California.  (*Id.* at 221-222 (discussing Exhibit 314).)  Defense counsel did not elicit testimony regarding the weight of the package or its contents.  (*See generally*, *id.* at 217-223.)

### 2.     Jarrett Farias

Dr. Farias testified that he is a forensic chemist working for the Drug Enforcement Administration ("DEA").  (*Id.* at 225.)  Dr. Farias testified that "[a]nabolic steroids are drugs or compounds and hormones that are related to testosterone, and they are controlled substances under Schedule III" of the Controlled Substances Act.  (*Id.* at 228:4-6.)

In Dr. Farias's experience, when exhibits are sent to the lab, the DEA enters the exhibits into a Laboratory Information Management System ("LIMS").  (*Id.* at 229.)  The exhibits are

1  assigned numbers, and LIMS is used to track the exhibits' locations, which could be in a vault,

2  checked out by a chemist, or en route back to an agency.  (*Id.*)

3  When investigating an exhibit, Dr. Farias first takes and records the exhibit's gross weight,

4  meaning the packaging and evidence bag itself as well as the contents.  (*Id.* at 231.)  He then takes

5  and records the net weight, or the weight of the substance minus any packaging.  (*Id.*)

6  Dr. Farias analyzed four exhibits for the case, one of which was split into two subexhibits.

7  (*Id.* at 233.)  Each of the exhibits was assigned a LIMS number and weighed.  (*Id.* at 234.)  One of

8  the exhibits contained pill capsules, which in turn contained powder that Dr. Farias determined to

9  be oxymetholone, a controlled anabolic steroid.  (*Id.* at 236 (discussing Exhibit 1).)  The

10  remaining exhibits and subexhibits were glass vials containing liquids, which Dr. Farias

11  determined to contain the anabolic steroids trenbolone acetate, testosterone enanthate, testosterone

12  decanoate, testosterone phenylpropionoate, testosterone isocaproate, and testosterone propanoate.

13  (*Id.* at 237-239 (discussing Exhibits 7, 11, and 13).)

14  After completing his analysis, Dr. Farias re-weighed the exhibits to account for the amount

15  of the substances that were consumed by the testing process and to ensure there was no tampering.

16  (*Id.* at 240.)  Another forensic chemist then reviewed Dr. Farias's work.  (*Id.*)

17  On cross-examination, Dr. Farias testified that different exhibits from the seized package

18  were assigned to different chemists for analysis.  (*Id.* at 242.)  Dr. Farias testified that one of the

19  exhibits which he analyzed for this case did not contain any controlled substances.  (*Id.* at 244-

20  245.)

21  **3.    Seth Hidalgo**

22  Mr. Hidalgo testified that he is a forensic chemist with the DEA.  Mr. Hidalgo analyzed

23  Exhibits 3 and 9 and detected the presence of anabolic steroids testosterone enanthate and

24  nandrolone decanoate.  (*Id.* at 250-251.)  Mr. Hidalgo's analysis was reviewed by another chemist

25  in the lab's quality group and determined to be correct.  (*Id.* at 251.)

26  The defense did not cross-examine Mr. Hidalgo.  (*Id.*)

27  **4.    Sandy Vong**

28  Ms. Vong testified that she, too, is a forensic chemist with the DEA.  Ms. Vong analyzed

Exhibit 5 and detected the anabolic steroid testosterone propionate.  (*Id.* at 255-256.)  Another chemist reviewed Ms. Vong's work and approved her analysis.  (*Id.* at 256.)

The defense did not cross-examine Ms. Vong.  (*Id.*)

### 5.    Daniel Harris

Mr. Harris testified that he was formerly a police officer with the Antioch Police Department ("APD").  (*Id.* at 263.)  Mr. Harris worked for APD in the field between September 2015 and September 2019.  (*Id.*)  In September 2019, Mr. Harris was reassigned to the APD police academy as an instructor.  (*Id.*)  In June 2020, Mr. Harris took disability leave from APD and did not return to service before his resignation in December 2022.  (*Id.* at 263-264.)

Mr. Harris was originally charged alongside Defendant for Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids.  (Indictment, Count One.)  He was also charged in this case with Attempted Possession with Intent to Distribute Anabolic Steroids in violation of 21 U.S.C. section 841(a)(1) and (b)(1)(E)(i) and in a related case with Bank Fraud in violation of 18 U.S.C. section 1344(1)-(2).  (*Id.*, Count Two; *United States v. Harris*, No. 24-cr-00502-JSW, Dkt. No. 1, Information.)  In September 2024, Mr. Harris entered a guilty plea in both cases.  (Dkt. No. 113, Harris Plea Agreement; Trial Tr., Vol. I, at 264-265.)

Mr. Harris testified that he obtained anabolic steroids from a source in Florida and that he ordered the steroids through a secure email account.  (Trial Tr., Vol. I, at 268-270.)  Mr. Harris used the alias "Danny Moore" when ordering steroids.  (*Id.* at 271.)  Mr. Harris resold steroids to contacts, sometimes using steroids from his own supply and sometimes placing orders tailored for his customers.  (*Id.* at 275-276.)  Mr. Harris's customers included a man in Utah as well as police officers from APD, Pittsburgh Police Department, and the Contra Costa County Sheriff's Office.  (*Id.* at 284.)

Mr. Harris and Defendant met while working at the APD.  (*Id.* at 285.)  At one point, Defendant texted Mr. Harris, "Bro. . . I need some test or growth shit in my life."  (*Id.* at 288:3-7 (discussing Exhibit 41, text messages between Mr. Harris and Defendant).)  Mr. Harris understood "test" to refer to testosterone and "growth" to refer to human growth hormone.  (*Id.* at 290.)  This precipitated a series of text messages which alluded to Defendant beginning personal use of

United States District Court
Northern District of California

anabolic steroids.  Mr. Harris texted Defendant, "Let me know when you want to get going." (*Id.* at 292:2-3.)  Defendant responded, "ASAP.  What do I have to do and how much?" (*Id.* at 292:6-7.)  Defendant also texted Mr. Harris, "My dad might want some too.  He's trying to cut fat and gain muscle." (*Id.* at 294:5-6.)

Defendant visited Mr. Harris at Mr. Harris's home.  (*Id.* at 295.)  Mr. Harris discussed potential paths for obtaining steroids, and Defendant explained that he wanted steroids to help him train to become a Green Beret.  (*Id.* at 295-296.)  Defendant did not want to get a prescription for testosterone, which would have been legal, and instead opted to purchase a bottle of testosterone from Mr. Harris.  (*Id.* at 298.)  Purchasing from Mr. Harris was faster and cheaper than obtaining through a doctor.  (*Id.* at 296.)  Mr. Harris helped Defendant to administer his first injection during the visit.  (*Id.* at 299.)  Defendant paid Mr. Harris for the testosterone via Venmo, a digital payment application.  (*Id.* at 300.)

The next day, Defendant texted Mr. Harris, "Bro, holy shit man, I'm already feeling it.  I have more energy, less recovery time between sets and just feel f'ing juicy, Bro." (*Id.* at 302:7-8 (as read).)  Mr. Harris responded, "Yee. . . Welcome to the anabolic club." (*Id.* at 302:16-18.)  By "anabolic club," Mr. Harris meant, "[a]nabolic steroid club." (*Id.* at 302:19-20.)  Mr. Wenger responded "that he was f'ing stoked to be here, bro, only regret he didn't join sooner." (*Id.* at 302:21-23 (as read).)  Mr. Harris responded by laughing and texting, "Usually the response I get." (*Id.* at 302:24-25.)  Mr. Harris also texted Defendant to "keep it hush you're taking anything" so that he would not be "blacklisted" like Harris.  (*Id.* at 303:21, 304:7.)  Defendant texted, "Oh bro, I am for sure." (*Id.* at 303:23.)

Defendant later put Mr. Harris in contact with an individual named Brendon Mahoney. (*Id.* at 304.)  Mr. Mahoney reached out to Mr. Harris via text message and then spoke with Mr. Harris on the phone.  (*Id.* at 306.)  Like Defendant, Mr. Mahoney wanted steroids to enhance his performance while training for the Green Beret program.  (*Id.*)  Defendant did not participate in the phone conversation, but he contacted Mr. Harris afterwards and conveyed that Mr. Mahoney wanted to purchase testosterone from Mr. Harris.  (*Id.* at 307.)  Mr. Harris agreed with Defendant to obtain a bottle of testosterone for Mr. Mahoney and to give Defendant the bottle to pass along

to Mr. Mahoney.  (*Id.*)  Mr. Harris subsequently placed a bulk order from his Florida contact, part of which was to be delivered to Harris's home in Discovery Bay.  (*Id.* at 310.)

In late February 2022, Defendant texted Mr. Harris and asked if he could stop by Harris's home "to pick up some shit."  (*Id.* at 311:1-2.)  Defendant then went to Mr. Harris's home, Mr. Harris provided Defendant with testosterone, and Defendant paid Mr. Harris via Venmo.  (*Id.* at 311-312.)

On March 2, 2022, Defendant texted Mr. Harris, "Can I come by Monday or Sunday to pick up Brendon's stuff?"  (*Id.* at 313:13-14.)  On March 9, 2022, Defendant followed up, texting, "Calling to see if I can pick up Mahoney's stuff."  (*Id.* at 314:20-23.)  Mr. Harris responded by sending Defendant a picture of the shipping label on the steroid delivery and telling Defendant that the delivery was late.  (*Id.* at 314-315.)  Defendant texted, "No worries.  I'll give him my new one and take one of his.  Does that work?"  (*Id.* at 315:20-21.)  Mr. Harris responded, "I think I have a bottle or two of Sus. . . I can let you know, but just waiting on this damn order."  (*Id.* at 316:1-4.)  By "Sus," Mr. Harris was referring to Sustanon, a form of testosterone.  (*Id.*)

Mr. Harris never received the order because it was seized by USPIS.  (*Id.* at 316-318.)  Mr. Harris confirmed that the package, introduced in court as Exhibit 15, matched the order of Schedule III substances that he had placed to his home.  (*Id.* at 318.)  Mr. Harris also confirmed that the vials in Exhibits 9, 11, and 13 contained anabolic steroids and were seized from his home during a search in March 2022.  (*Id.* at 323.)

Search warrants were executed at the homes of Mr. Harris and Defendant in March 2022.  Mr. Harris and Defendant maintained contact after those searches.  (*Id.* at 327.)  At some point after the warrants were executed, Mr. Mahoney contacted Mr. Harris.  (*Id.*)  Mr. Harris told Defendant about the contact, and Defendant told Mr. Harris not to talk to Mr. Mahoney.  (*Id.* at 327-328.)

On cross-examination, the defense elicited testimony that tended to undermine Mr. Harris's credibility.  Mr. Harris admitted to falsifying documents on a loan application to purchase his home.  (*Id.* at 339-340.)  Mr. Harris admitted to violating his oath as a police officer.  (*Id.* at 341.)  The defense also elicited testimony that Defendant and Mr. Mahoney contacted Mr. Harris

for assistance in improving their athletic performance, not necessarily for assistance in obtaining steroids. (*Id.* at 344.) Mr. Harris first told the Government in April 2025 that he gave Defendant testosterone, despite multiple interviews and contacts with investigating agents over the last few years. (*Id.* at 347.) Mr. Harris agreed that he is incentivized to testify against Defendant in order to have the Government recommend a low sentence for Mr. Harris. (*Id.* at 353.)

Mr. Harris also reiterated on cross that he believed Mr. Mahoney would pay Defendant who would in turn pay Mr. Harris for the steroids. (*Id.* at 364.) Mr. Harris testified that he was traveling between California and Texas at the time, and it was possible that Mr. Mahoney was in military training, so that it would be most convenient for Defendant to pick up "something" for Mr. Mahoney, "given the logistics." (*Id.* at 364:23-25.) The only written record of the agreement was in the text messages introduced in court. (*Id.* at 365.)

On redirect, Mr. Harris testified that he and Defendant did not have a "falling out" and that he considered Defendant to be an acquaintance or friend. (*Id.* at 366.) Mr. Harris stated that Defendant specifically asked for testosterone and specifically asked that Mr. Harris acquire testosterone for Mr. Mahoney. (*Id.* at 367.)

### 6.    Brendon Mahoney

Mr. Mahoney testified that he is in the U.S. Army and assigned to Fort Bragg, North Carolina. (*Id.* at 371.) Mr. Mahoney was previously in the California National Guard, although he lived in Oregon at the time. (*Id.* at 371-372.) Defendant and Mr. Mahoney met in 2021 at a National Guard training event for persons interested in joining strategic forces, and the two became friends. (*Id.* at 372-373.) Mr. Mahoney communicated with Defendant once or twice a week via Signal and text messages. (*Id.*)

In late 2021 or early 2022, Defendant put Mr. Mahoney in touch with Mr. Harris. (*Id.* at 374.) Defendant showed Mr. Mahoney pictures of Mr. Harris before and after Mr. Harris began using testosterone, and Mr. Mahoney was impressed by how fit Mr. Harris looked. (*Id.* at 374-375.) Defendant told Mr. Mahoney that he had obtained testosterone from Mr. Harris and that it had improved his training. (*Id.* at 376.) Mr. Mahoney then asked Defendant to help him acquire testosterone for his own use. (*Id.*)

United States District Court
Northern District of California

1    Mr. Mahoney testified that he and Mr. Harris spoke on the phone, and that the two ended

2    the call with Mr. Mahoney "interested in trying the testosterone out." (*Id.* at 377:2.)  Mr.

3    Mahoney "figured" that the testosterone "would just come through [Defendant], [Defendant] and

4    Mr. Harris would figure it out." (*Id.* at 378:2-3.)  Mr. Mahoney also testified that Defendant told

5    Mr. Mahoney he could pick up the testosterone from Defendant. (*Id.*)  Mr. Mahoney did not

6    provide Mr. Harris with his address. (*Id.* at 377.)

7    Mr. Mahoney saw Defendant at a training event in March 2022. (*Id.* at 379.)  Mr.

8    Mahoney and Defendant maintained their friendship through 2022. (*Id.* at 380.)

9    In May 2023, FBI agents questioned Mr. Mahoney about soliciting testosterone from

10   Defendant. (*Id.*)  Mr. Mahoney did not give truthful answers to those agents. (*Id.* at 381.)  He

11   then contacted Defendant, upset about being questioned. (*Id.*)  Mr. Mahoney testified that

12   Defendant then told him, "don't worry about it, you know, you haven't done anything wrong. . .

13   they're only going to know what you tell them.  And, you know, you haven't – you didn't buy

14   anything.  You didn't receive anything.  You haven't done anything wrong." (*Id.* at 381:17-24.)

15   Mr. Mahoney did not agree with Defendant's suggestion because "there's also text messages

16   between us, and all of that is documented.  So . . . there's really nothing to hide." (*Id.* at 382:5-7.)

17   On cross-examination, Mr. Mahoney testified that the Army tests for steroids, so using

18   steroids could have ended his and Defendant's careers. (*Id.* at 383-384.)  Mr. Mahoney testified

19   that he did not see how testosterone would have helped Defendant's lungs after Defendant

20   recovered from COVID-19, but peptides would have helped Defendant's body recover. (*Id.* at

21   384.)

22   Mr. Mahoney further testified that he contacted Mr. Harris himself, and that, because Mr.

23   Harris had his contact information, there was no need for Defendant to be involved in Mr.

24   Mahoney's payment for the steroids or for Mr. Harris to send the steroids to Mr. Mahoney. (*Id.* at

25   385.)

26   The defense asked Mr. Mahoney about the timeline of his interviews with the FBI,

27   suggesting that Mr. Mahoney's recollection was shaped by his multiple contacts. (*Id.* at 386-387.)

28   Mr. Mahoney admitted that he did not tell the agents that he wanted to buy steroids until the last

United States District Court
Northern District of California

few interviews, which took place in 2025.  (*Id.* at 387.)

On redirect, Mr. Mahoney stated that he testified before the grand jury in July 2023 that Defendant told him he took testosterone and that Mr. Mahoney wanted to buy testosterone from Mr. Harris.  (*Id.* at 388.)

### 7.    Special Agent Teak Wilson

SA Wilson testified that she is a Supervisory Special Agent with the FBI.  (*Id.* at 390.)

On March 23, 2022, SA Wilson assisted the state with execution of a California search warrant for Defendant's cell phone.  (*Id.*)  SA Wilson arrived at Defendant's home around 8:00 a.m. and phoned Defendant between 8:02 a.m. and 8:03 a.m.  (*Id.* at 391.)  Defendant answered the phone.  (*Id.* at 392.)  SA Wilson told Defendant that she was with the FBI and asked Defendant to exit his residence with his cell phone.  (*Id.*)  SA Wilson asked Defendant where he was.  (*Id.*)  Defendant did not exit the residence and instead ended the call.  (*Id.*)

SA Wilson attempted to call Defendant seven more times, but Defendant did not answer. (*Id.* at 393.)  SA Wilson then texted Defendant, "Devon, this is the FBI.  We have a warrant.  Exit your residence with all occupants.  Use the garage.  We are not leaving."  (*Id.* at 394:9-11 (quoting Exhibit 67).)  SA Wilson texted Defendant five more times before he responded, "How many cars do you see in the driveway?  Make, model, color, license plate.  Body type."  (*Id.* at 395:5-8.)

SA Wilson responded, "Devon, I'm outside 2293 Reef.  I'm waiting here to talk with you about the warrant."  (*Id.* at 395:10-11.)  Defendant again asked about the cars in the driveway, and SA Wilson again asked Defendant to exit the residence.  (*Id.*)  Defendant responded, "This is horse shit.  Stop.  If you need me, find me or get a new scam.  This one ain't working."  (*Id.* at 39521-23.)  At 8:29 a.m., SA Wilson texted, "Devon, we can talk about this face to face now.  It's your choice."  (*Id.* at 396:3-5.)  At 8:30 a.m., SA Wilson texted, "Your chief is calling you."  (*Id.* at 396:6-8.)  By "chief," SA Wilson referred to the chief of police for whom Defendant worked. (Dkt. No. 220, Trial Tr., Vol. II, at 405.)

Defendant then agreed to meet with the agents away from his home.  SA Wilson, another FBI agent, members of the San Francisco SWAT team, and an Investigator from the Contra Costa County District Attorney's Office met Defendant at Delta RV Boat Storage in Byron, California.

United States District Court
Northern District of California

1   (*Id.* at 406.)  Defendant arrived at approximately 9:00 a.m.  (*Id.* at 407.)  Defendant exited his car,

2   approached the agents, and "indicated his cell phone was in the center console of the vehicle."  (*Id.*

3   at 407:8-9.)

4       On cross-examination, SA Wilson testified that the search warrant did not allow

5   investigators to search Defendant's home or vehicle, and it did not allow SA Wilson to arrest

6   Defendant.  (*Id.* at 408.)  SA Wilson testified that, after Defendant communicated with his chief,

7   he met with the agents, provided his cell phone, and provided the PIN to his cell phone.  (*Id.* at

8   410.)

9       **8.    Special Agent Alexandra Cabrera**

10      SA Cabrera testified that she is a supervisory Special Agent with the FBI assigned to the

11  major cybercrimes unit.  (*Id.* at 412.)  SA Cabrera moved to the Washington, D.C. area in August

12  2022, and previously worked in San Francisco.  (*Id.*)

13      In March 2022, SA Cabrera was assigned to participate in the search of Defendant's cell

14  phone in her capacity as a DExT (digital evidence extraction technician) tech.  (*Id.* at 414.)  She

15  was assigned to work with another FBI agent and Contra Costa County District Attorney

16  Investigator Darryl Holcombe.  (*Id.* at 415.)

17      Around 9:00 a.m., SA Cabrera received Defendant's cell phone from DAI Holcombe.  (*Id.*)

18  SA Cabrera took steps to ensure the phone could not be remotely erased.  (*Id.* at 416.)  She

19  ensured the Wi-Fi and Bluetooth were off, and she disabled the U1 UWB chip.  (*Id.*)  SA Cabrera

20  also ensured the phone was in airplane mode.  (*Id.*)  She plugged the phone into a "power only"

21  car charger, which was incapable of transmitting any data to the phone.  (*Id.* at 416-417.)

22      SA Cabrera testified that she then searched "for messaging content that might be pertinent

23  for the case team."  (*Id.* at 417:12-13.)  She observed that Defendant used the Signal application,

24  an end-to-end encrypted messaging app.  (*Id.*)  SA Cabrera checked to make sure the global Signal

25  feature that automatically deletes messages was off and to determine which chats within the app

26  had their own automatic deletion timers.  (*Id.* at 418.)  She found five conversations with deletion

27  timers, and she was unable to turn off the timers because the device was no longer connected to

28  the Internet.  (*Id.* at 420-421.)  These were: "freedom coalition chat," "firearms team," "red

swings," "gai boys," and "blue swings." (*Id.* at 420.) The shortest timer was for one hour, meaning that messages within the conversation would be erased one hour after they were sent. (*Id.*) SA Cabrera shared her findings with DAI Holcombe, and DAI Holcombe took the phone. (*Id.* at 422.) SA Cabrera did not make any other changes to the phone. (*Id.*)

On cross-examination, SA Cabrera testified that she received the phone from DAI Holcombe at 9:19 a.m. (*Id.* at 424.) SA Cabrera was unaware of the amount of time that DAI Holcombe possessed the phone before he provided the phone to SA Cabrera. (*Id.*) SA Cabrera further testified that the Wi-Fi and Bluetooth were disabled and the phone was in airplane mode at the time she obtained the phone, so DAI Holcombe likely changed those settings. (*Id.*)

SA Cabrera additionally testified that Defendant was not the "administrator" of the five Signal chats with automatic deletion timers, meaning Defendant did not set the timers for those groups. (*Id.* at 427-428.) SA Cabrera possessed the phone "for a little over an hour." (*Id.* at 428:17-18.)

### 9.     District Attorney Investigator Darryl Holcombe

DAI Holcombe testified that he is a senior inspector with the Contra Costa County District Attorney's Office. (*Id.* at 430.) DAI Holcombe was offered as an expert in digital forensics, without objection. (*Id.* at 437.)

DAI Holcombe testified that an FBI agent collected Defendant's cell phone and handed the phone to DAI Holcombe. (*Id.* at 440-441.) Defendant provided DAI Holcombe with the PIN for the device. (*Id.* at 442.) DAI Holcombe placed the phone in airplane mode and then gave the phone and passcode to the FBI agents. (*Id.*) After the FBI agents reviewed the phone, DAI Holcombe locked the phone and took it to the District Attorney's Office. (*Id.* at 443.)

At the DA's office, DAI Holcombe used Graykey software to do a full file system extraction of the cell phone. (*Id.*) Once the data was extracted, he used a combination of Cellebrite and Magnet Axiom software to process the data. (*Id.* at 444.)

DAI Holcombe testified that iPhone activity is tracked and stored in a binary file called "Biome." (*Id.* at 448.) "And so, for example, if a user was to delete an iMessage thread between that phone and another user, it theoretically is gone from the user interface. . . But it is possible

11

that the data has now also been stored in this – this Biome system that is tracking – tracking the phone in the background." (*Id.* at 448:21-449:2.)  DAI Holcombe identified user-deleted data including: all messages directly between Defendant and Mr. Harris, (*id.* at 450); all messages directly between Defendant and Mr. Mahoney, (*id.* at 472-473); contact entries for Mr. Harris and Mr. Mahoney, (*id.* at 487); a Venmo contact entry for Mr. Harris, (*id.*); call log entries between Defendant and Mr. Mahoney, (*id.* at 489); and a Signal message from the group conversation "operators" received by Defendant from a user named "Randy Gregg" at 8:16 a.m. on March 23, 2022, (*id.* at 493-494).

DAI Holcombe opined that the messages between Defendant and Mr. Harris were deleted between March 10, 2022 and March 23, 2022, because the last message recovered by the software was sent on March 10, and DAI Holcombe inspected the phone on March 23.  (*Id.* at 469-470.) DAI Holcombe further opined that the messages between Defendant and Mr. Mahoney were deleted between March 17, 2022 and March 23, 2022, because the last message recovered by the software was sent on March 17.  (*Id.* at 485.)

On cross-examination, DAI Holcombe testified that the Graykey report for Defendant's phone showed that Defendant's phone had been backed up to iCloud on March 22, 2022, at 10:43 p.m. (*Id.* at 499.)  DAI Holcombe did not take any steps to obtain the iCloud information and was not asked to do so.  (*Id.*)  He searched the phone data for content relating to Messrs. Harris and Mahoney, as well as other names and phone numbers which he was given.  (*Id.* at 500.)  DAI Holcombe further testified that sometimes cell phone users delete messages and other content in order to free space on the phone.  (*Id.* at 503.)  The defense also elicited that DAI Holcombe could not determine the exact time that content was deleted and could not rule out that some person other than Defendant had deleted the content.  (*Id.* at 505-506.)

On redirect, DAI Holcombe stated that the FBI agent who seized Defendant's phone possessed the phone for two or three minutes before handing it to DAI Holcombe.  (*Id.* at 506.) He also stated that he observed the FBI agents' review of Defendant's phone and the agents did not delete any messages.  (*Id.* at 506-507.)

**B.    Defense Motions During Trial.**

After the Government rested, Defendant moved for a judgment of acquittal on both counts under Rule 29.

**10.    Count One, Conspiracy.**

Defendant argued that the conspiracy charge must fail because offering to pick up something for a friend is not conspiracy to distribute. (*Id.* at 509-510.) He further argued that the charge rested on the testimony of Mr. Harris, who was fundamentally unreliable due to his fraud charges and desire to appease the government. (*Id.* at 509.)

On rebuttal, the Government argued that connecting a friend to a known controlled substance dealer and then offering to pick up controlled substances to deliver to that friend was a conspiracy to distribute. (*Id.* at 511.) The Government argued that Mr. Harris's testimony was buttressed by the electronic evidence and Mr. Mahoney's testimony. (*Id.*)

The Court denied the motion on the record. It held that a jury could find an agreement because of the text messages between and testimony of Messrs. Harris and Mahoney that Mahoney would pay Defendant to pay Harris, and that Defendant would pick up the steroids from Harris to deliver to Mahoney. (*Id.* at 514.) The Court further held that a jury could find that Defendant entered the agreement knowing of its purpose because the messages showed Defendant solicited Mr. Harris for steroids specifically and that he knew steroids were in the delayed package. (*Id.*)

**11.    Count Two, Obstruction.**

Defendant argued that the Section 1519 count must fail because the Government could not produce any information about when, why, or by whom content on Defendant's phone was deleted. (Trial Tr., Vol. II, at 509.) Defendant argued that the Government should have and did not make an effort to determine the memory capacity of the phone, which would be a common and obvious reason for deletions. (*Id.*)

The Government argued that obstruction could be determined from the specificity of Defendant's deletions: he deleted traces of Messrs. Harris and Mahoney, but left thousands of other messages and call logs intact. (*Id.* at 511-512.) The Government also argued that Defendant

1    had the opportunity to delete messages between approximately 8:00 a.m., when he first learned of

2    the warrant, and 9:00 a.m., when he handed over his phone, and that at least one deletion was

3    evident because of the missing 8:16 a.m. Signal message.  (*Id.* at 513.)

4        The Court denied the motion on the record.  It held that a reasonable jury could find that

5    Defendant knowingly altered documents because the Cellebrite report reflected user-deleted

6    messages between the Defendant and Messrs. Harris and Mahoney, because Defendant deleted

7    Messrs. Harris and Mahoney from his contact list, and because Defendant deleted Mr. Harris's

8    contact on Venmo.  (*Id.* at 515.)  The Court further held that a reasonable jury could find that

9    Defendant deleted the messages in the window between his first contact with the investigators and

10   the seizure of his phone.  (*Id.*)

11   **C.    Instructions Regarding Contact with the Jury.**

12       The Court repeatedly instructed the jury, as it does in all jury trials, to avoid contact with

13   any person or information source that could relate to the proceedings, including the Court itself.

14   On the day of jury selection, the Court instructed the entire panel of potential jurors on the

15   Conduct of the Jury Instruction.  *See* Manual of Model Criminal Jury Instructions, Instruction 1.8,

16   Conduct of the Jury; Dkt. No. 165-1, Slideshow, at 22-33.  After the jury was selected, the Court

17   provided the jurors with written copies of the Conduct of the Jury Instruction and asked the jurors

18   to submit signed certifications agreeing to abide by the Instruction.

19       Each afternoon of trial, the Court instructed the jury:

20       So as I indicated to you before this trial started, you, as jurors, will decide this case
         based solely on the evidence presented in this courtroom.  This means that after you
21       leave here for the night, you must not conduct any independent research about this
         case, the matters in the case, the legal issues in the case, or the individuals or other
22       entities involved in the case.

23       This is important for the same reasons that jurors have long been instructed to limit
         their exposure to traditional forms of media information such as television and
24       newspapers.  You also must not communicate with anyone in any way about this
         case.  And you must ignore any information about the case that you might see while
25       browsing the Internet or your social media feeds.

26   (Trial Tr., Vol. I, at 397:4-17.)

27       In the morning, the Court asked the jury in open court whether any juror had "learned

28   about or shared any information about this case outside of the courtroom, even if it was

14

accidental." (Trial Tr., Vol. II, at 403:15-18.)

Before each break during the trial, the Court reminded the jurors not to discuss the case. (Trial Tr., Vol. I, at 280:6-8 ("Please remember the Court's admonitions from last week. Don't discuss the case, don't make up your mind, don't get any outside information."); *id.* at 355:11-12 ("Remember the Court's usual admonitions. Keep an open mind. Do not discuss the case."); Trial Tr. Vol. II, at 451:20-21 ("Please remember to keep an open mind and don't discuss the case."); *id.* at 507 ("Remember the Court's admonitions.").)

After the parties rested their cases, the Court instructed the jury:

> As I indicated to you before this trial started, you, as jurors, will decide this case based solely on the evidence presented in this courtroom, which you've now heard.

> This means that after you leave here for the night, you must not conduct any independent research about this case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case.

> This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers.

> You also must not communicate with anyone in any way about this case. You must ignore any information about the case that you might see while browsing the internet or your social media feeds. Now, although I don't expect necessarily there'll be any media coverage, I don't know one way or the other, but it's really important that you avoid that completely.

> If you are inadvertently exposed to that briefly, media coverage – and again I have no knowledge that there would be or wouldn't be – you're to turn away from it and turn it off or not look at it, and then report that to the Court as soon as possible tomorrow so we can deal with that. But we really want you to avoid any outside information.

> And the reason is, I can say now as I said before, you saw the careful processes that the Court and the parties go through to present evidence to you. A lot of evidence, you know, that parties would like to put in is excluded because of the rules don't allow it.

> So the law carefully prescribes what you can consider in rendering a verdict. And if you were to get outside information from any source, including the media or other people, number one, we wouldn't know it and we couldn't – the parties couldn't meet it, couldn't explain it.

> Number two, it's almost certainly going to be improper evidence that you would never be allowed to see in – in the proper processes of the court. And that would corrupt the entire process.

> And both sides, both sides have the right in our system to know what evidence

United States District Court
Northern District of California

15

1   you're going to consider and address it. and they have a right to have you decide
2   this case based only on the evidence that you find, you know, to be true beyond
    a reasonable doubt and the law that I give to you as to how you can apply those
    facts that you find to the evidence.

3       So that's a lot of words. It's a lot of verbiage. But it explains to you why it's
4   so important that you keep your – yourself away from any outside information.

(Trial Tr. Vol. II, 520:10-522:5.)

        Before closing arguments, the Court instructed the jury, in relevant part:

        Please do not read into these instructions or into anything I may have said or
        done as any suggestion as to what verdict you should return. That is a matter
        entirely up to you. (Dkt. No. 221, Trial Tr., Vol. III, at 544:9-12.)

        In reaching your verdict, you may consider only the testimony and exhibits
        received in evidence. The following things are not evidence and you may not
        consider them in deciding what the facts are. . . . Three, anything you may have
        seen or heard when the court was not in session is not evidence. You are to
        decide the case solely on the evidence received at the trial. (*Id.* at 545:21-24,
        546:15-17.)

        Because you must base your verdict only on the evidence received in the case
        and on these instructions, I remind you that you must not be exposed to any
        other information about the case or to the issues it involves.

        Except for discussing the case with your fellow jurors during your deliberations,
        do not communicate with anyone in any way and do not let anyone else
        communicate with you in any way about the merits of the case or anything to
        do with it.

        This restriction includes discussing the case in person, in writing, by phone,
        tablet, computer, or any other means, via email, text messaging, or any Internet
        chat room, blog, website, or any other forms of social media.

        This restriction applies to communicating with your fellow – with your family
        members, your employer, the media or press, and the people involved in the
        trial.

        If you are asked or approached in any way about your jury service or anything
        about this case, you must respond that you have been ordered not to discuss the
        matter and to report the contact to the Court.

        Do not read, watch, or listen to any news or media accounts or commentary
        about the case or anything to do with it.

        Do not do any research such as consulting dictionaries, consulting the Internet,
        or using other reference materials. And do not make any investigation or in any
        other way try to learn about the case on your own.

        The law requires these restrictions to ensure the parties have a fair trial based
        on the same evidence that each party has had an opportunity to address. A juror
        who violates these restrictions jeopardizes the fairness of these proceedings and
        a mistrial could result that would require the entire trial process to start over. If
        any juror is exposed to any outside information, please notify the Court

immediately. (*Id.* at 610:11-611:18.)

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy signed by any one or more of you.

No member of the jury should ever attempt to communicate with me except by a signed writing. And I will respond to the jury concerning the case only in writing or here in open court. (*Id.* at 612:9-15.)

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on any question submitted to you including the question of guilt of the defendant until after you've reached a unanimous verdict or have been discharged. (*Id.* at 612:20-24.)

The Court swore in a Court Security Officer to guard the jury room door while deliberations were underway. (*Id.* at 614.) The Court recessed at 10:13 a.m. on April 30, 2025 for jury deliberations. (*Id.* at 615:19.) The undersigned went immediately to chambers and did not leave or go elsewhere until resuming session at 12:57 p.m. The Courtroom Deputy provided the jury with one copy of the final jury instructions in a binder and one blank copy of the verdict form.

**D.    The Return of the Verdict.**

Shortly after noon on April 30, 2025, the Courtroom Deputy informed the Court that the jury had reached a verdict and provided the Court with the verdict form, which had been signed and marked in pen. The Court saw that the jury had voted "guilty" on both counts and handed the verdict form back to the Courtroom Deputy. The Courtroom Deputy asked if she should summon the parties and seat the jury in the courtroom, or if the jury could eat their lunches first. The Court instructed the Courtroom Deputy to contact the parties but to allow the jury to finish lunch.

Because the conspiracy charge required mandatory remand in the event of a conviction, and because Defendant is a former police officer, the Court sought to speak with the U.S. Marshal Service ("USMS") before receiving the verdict in the courtroom to ensure that Defendant could safely be taken into custody. At some time between 12:30 p.m. and 12:57 p.m., two U.S. Marshals spoke with the Court in chambers. The USMS informed the Court that they could not guarantee Defendant's safety if he were to be remanded that day because there was no immediately available bed in protective custody.

While the Court was waiting to communicate with USMS, the Courtroom Deputy seated the jury in the jury box. (*See* Dkt. No. 217-2, Declaration of Dena Marie Young, at ¶¶ 5, 8.)

United States District Court
Northern District of California

1    When the Courtroom Deputy learned that the Court was not ready to resume, she returned the jury

2    to the jury deliberation room.  (*Id.* ¶ 9.)  A Court Security Officer remained stationed at the jury

3    deliberation door.  No juror entered chambers or otherwise communicated in any way with the

4    Court, and the undersigned did not leave chambers or otherwise communicate in any way with the

5    jury.

6         After returning the jury to the deliberation room, the Courtroom Deputy returned to the

7    courtroom and waited with another Courtroom Deputy who was assisting the Court.  Counsel for

8    Defendant attests that she overheard one whisper to the other, "He's guilty," and the other

9    respond, "That's how fast it can change."  (*Id.* ¶ 11.)  Defendant attests he heard a similar

10   statement.  (Dkt. No. 217-3, Declaration of Devon Wenger, ¶ 9 ("Several minutes later, I heard the

11   court clerk with the glasses tell the other clerk, 'He's guilty.'  The two clerks exchanged a look,

12   then the clerk with the glasses said, 'That's how quickly it can change.'").)  Defendant's mother

13   attests she heard one court clerk say, "he's guilty, that's how fast it can change."  (Dkt. No. 217-4,

14   Declaration of Samantha Thomas-Gomez, ¶ 10.)  Both Defendant and his mother attest that the

15   court clerk stated that the judge wanted to speak with the jury.  (Wenger Decl., ¶ 8 ("After the jury

16   was sent out, the same court clerk said that the judge is having a meeting with the jury.");

17   Thomas-Gomez Decl., ¶ 8 ("The court clerk went to get the judge but then came back in and

18   yelled from the judge's door entrance that the judge needs 10 minutes and wants to sit with the

19   jury.").)  Counsel for Defendant remembers this statement differently, and she attests that "[One

20   Courtroom Deputy] went to get the judge but then came back in and told [the other Courtroom

21   Deputy] that the judge was not ready to sit with the jury."  (Young Decl., ¶ 8.)

22        Meanwhile, after speaking with the USMS, the Court informed the Courtroom Deputy that

23   it was ready to resume proceedings.  Court resumed at 12:57 p.m. with the jury still in the

24   deliberation room.  (Dkt. No. 205-1, Trial Minute Sheet.)  Upon resuming proceedings, the Court

25   stated that it understood the jury had reached a verdict, and it asked the Courtroom Deputy to

26   bring in the jury from the jury deliberation room.  (Trial Tr., Vol. III, at 616:1-3.)

27        Once the jury was seated, the Court asked the foreperson for the verdict.  The Courtroom

28   Deputy took the verdict envelope from the foreperson and handed it to the Court.  (*Id.* at 616:8-9.)

1   The Court looked at the form and handed the form back to the Courtroom Deputy, who read the

2   verdict into the record.  (*Id.* at 616:11-617:5.)  The jury returned a verdict of guilty on both counts.

3   (Jury Verdict.)

4         After the verdict was read, the Court asked defense counsel if she had any requests.  (Trial

5   Tr., Vol. III, at 617:6.)  At counsel's request, the Court polled the jury.  Each juror confirmed the

6   verdict.  (*Id.* at 617:7-619:4.)  Defense counsel did not ask to poll the jury regarding any other

7   matter.

8         The Court then read the final discharge instruction to the jury.  After reading the

9   instruction, the Court asked the jury to wait briefly in the jury room so that he could thank the

10   jurors personally for their service.  (*Id.* at 620:3-5.)  The Court then released the jury.  (*Id.* at

11   620:17.)

12         Before leaving the courtroom to speak with the then-discharged jury, the Court discussed

13   remand with counsel.  (*Id.* at 620:18-626:10.)  Defendant argued briefly on the record that he was

14   not a flight risk, and the Government argued that immediate remand was mandatory.  The Court

15   ruled from the bench that extraordinary circumstances existed to not immediately remand

16   Defendant because USMS had concerns regarding Defendant's safety.  (*Id.* at 623:24-624:5.)  The

17   Court set a hearing and briefing schedule on the issue at Defendant's request, then adjourned.  (*Id.*

18   at 625:19-626:10.)  Defendant did not raise any issues regarding the return of the verdict, and

19   Defendant did not object upon the Court's disclosure that it had met with USMS.

20         Only after the verdict had been entered, the jury had been polled, and the jury had been

21   discharged did the Court interact with the jurors.  As he stated on the record that he would do, and

22   without any objection from the defense, the undersigned met briefly with the jury in the jury room

23   to thank the jurors for their service.  There was no other meeting between the Court and the jury.

24                                    \*\*\*

25         The Court set forth the above in a tentative ruling prior to oral argument on this motion.

26   (*See* Dkt. No. 225, Order Tentatively Denying Defendant's Motion for Judgment of Acquittal or

27   New Trial; Notice of Questions for Hearing.)  At oral argument on the motion, counsel for

28   Defendant confirmed that the Court has fairly characterized the record in this case.  (Dkt. No. 228,

United States District Court
Northern District of California

19

1    Hr'g Tr., at 6:22-23.)  Defendant does not dispute any facts set forth by the Court.  (*Id.*; *id.* at

2    8:13-14.)

3                                          **ANALYSIS**

4    **A.      Motion for Judgment of Acquittal.**

5              **1.      Applicable Legal Standards.**

6              Federal Rule of Criminal Procedure 29 permits the Court to set aside the verdict and enter

7    a judgment of acquittal for any offense for which the evidence was not sufficient to sustain a

8    conviction.  Fed. R. Crim. P. 29(a), (c).  The reviewing court's role is limited, because it is the role

9    of the jury to weigh evidence, determine the credibility of witnesses, and draw reasonable

10   inferences from the facts.  The court considers "whether, after viewing the evidence in the light

11   most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

12   of the crime beyond a reasonable doubt."  *Musacchio v. United States*, 577 U.S. 237, 243 (2016)

13   (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

14             **2.      The Government Submitted Sufficient Evidence of Conspiracy.**

15             As the Court found on Defendant's oral motion, the Government demonstrated sufficient

16   evidence of conspiracy for the issue to reach the jury and for a rational trier of fact to find

17   Defendant guilty beyond a reasonable doubt.  To prove a violation of 21 U.S.C. section 846, the

18   Government needed to demonstrate an agreement between Defendant and another person to

19   distribute anabolic steroids.  *See United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013)

20   ("To prove conspiracy, the government had to show . . . that Ramirez had an agreement with a

21   buyer pursuant to which the buyer would further distribute the drugs.").  The Government

22   presented evidence that Defendant knew Mr. Harris dealt anabolic steroids and that he purchased

23   testosterone from Mr. Harris for his personal use.  The Government also presented evidence that

24   Defendant introduced Mr. Mahoney to Mr. Harris for the purpose of obtaining testosterone for Mr.

25   Mahoney.  Defendant inserted himself into the transaction by agreeing to transport the testosterone

26   from Mr. Harris to Mr. Mahoney.  Both Mr. Harris and Mr. Mahoney assumed that Mr. Mahoney

27   would pay Defendant, who would in turn pay Mr. Harris, for the testosterone.

28             Defendant argues that the case relies on an unreliable witness, Mr. Harris, and his

United States District Court
Northern District of California

reconstruction of incomplete text messages.  Defendant had an opportunity to and did cross-examine Mr. Harris regarding his cooperation with the Government and inconsistencies with his testimony over time.  (Trial Tr., Vol. I, at 339-365.)  Defendant argued to the jury that they should not trust Mr. Harris.  (Trial Tr., Vol. III, at 583:4-587:12.)  The Court instructed the jury to view Mr. Harris's testimony with greater caution than that of other witnesses.  (Dkt. No. 203, Final Jury Instructions, at 16.)  The jury reasonably determined that Mr. Harris was credible.  The Court "may not substitute its view of the evidence for that of the jury."  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

Mr. Harris's testimony was corroborated by the testimony of Mr. Mahoney.  Mr. Mahoney was not criminally charged for his conduct in this case and did not enter a plea deal in exchange for his testimony.  On cross-examination, the defense elicited testimony from Mr. Mahoney that could have, but need not have, supported a jury inference that Mr. Mahoney's memory was unreliable or changed over time.  (*See* Trial Tr., Vol. III, at 383-387.)  The Government rehabilitated Mr. Mahoney by citing Mr. Mahoney's prior consistent testimony before the grand jury in 2023.  (*Id.* at 388.)  The jury reasonably credited Mr. Mahoney and his corroboration of Mr. Harris.  Again, it is not the Court's role to usurp the jury's credibility determinations. *Johnson*, 251 F.3d at 1227.

Mr. Harris and Mr. Mahoney's testimony was further consistent with the text messages produced in the case.  Mr. Harris texted Defendant, "Welcome to the anabolic club," and Defendant responded, "I'm fucking stoked to be here bro!  My only regret, I didn't join sooner." (Ex. 41, at EX041-013.)  "Anabolic club" logically relates to a group of individuals who use anabolic steroids.  The texts showed that Defendant later acted as a go-between for Messrs. Harris and Mahoney.  Defendant texted Mr. Harris, "Calling to see if I can pick up Mahoney's stuff," and Mr. Harris responded, "It's late my dude!!" with a picture of the tracking information for the intercepted package.  (Ex. 33, at EX033-007-008.)  Defendant then responded, "Fuck!  No worries, I'll give him my new one and take one of his, does that work?"  (*Id.* at EX033-008.)  Mr. Harris responded, "I think I have a bottle or 2 of sus.  I can let you know!  But just waiting in this damn order."  (*Id.*)  The delayed order contained anabolic steroids, and Mr. Harris referred to

United States District Court
Northern District of California

1    testosterone as "sus."  (*See* Exs. 1, 3, 5, 7, 16.)  The jury could reasonably infer that Defendant

2    entered an agreement with Mr. Harris to possess anabolic steroids and to redistribute those

3    anabolic steroids to Mr. Mahoney.

4         Defendant also argues that the Government manipulated the intercepted steroid package.

5    Shortly before trial, defense counsel became aware of the result of a Freedom of Information Act

6    ("FOIA") request made by Defendant's mother.  (Young Decl., ¶ 2.)  The FOIA response showed

7    tracking information for the package with a mailing weight "1.0625."  (*Id.*, Ex. B, at 3.)

8    Defendant claims that the package admitted in evidence weighed over 2 pounds, and so may have

9    been altered by the Government.  At oral argument, Defendant conceded that the weight of the

10   package was not entered into evidence at trial.  (Hr'g Tr., at 18:8-16.)  Defendant did not cross-

11   examine Inspector Singh, chemists Farias, Hidalgo, or Vong, or any of the Government's

12   witnesses regarding the weight of the package.  Defendant waited until after trial to raise the issue,

13   and Defendant has not established that the package weight was manipulated.  Before the hearing

14   on Defendant's motion, the Court asked the parties to respond to its understanding that the

15   "1.0625" number was inputted by the package sender and does not reflect the true package weight.

16   (Notice of Questions for Hr'g, No. 2.)  Defendant did not submit any evidence to the contrary

17   before or at the hearing in response to the Court's question.  (Hr'g Tr., at 20:15-18.)

18        Moreover, even if there were a discrepancy, Defendant has not demonstrated that cross-

19   examination on this topic would have prevented a reasonable jury from finding guilt beyond a

20   reasonable doubt.  The Government does not contend and did not argue at trial that Defendant

21   succeeded in distributing anabolic steroids to Mr. Mahoney, so the true weight and contents of the

22   package is of marginal relevance.  Defendant's text messages and the testimony of Messrs. Harris

23   and Mahoney contained sufficient evidence of conspiracy to distribute.  *Cf. United States v.*

24   *Brugnara*, 856 F.3d 1198, 1208 (9th Cir. 2017) (rejecting argument that wire and mail fraud

25   convictions must be overturned where one argument of government "was a component of that

26   evidence" but not "the linchpin of the case").

27        **3.      The Government Submitted Sufficient Evidence of Obstruction.**

28        In order to prove obstruction of justice in violation of 18 U.S.C. section 1519, the

22

Government needed to show: (1) Defendant knowingly destroyed or deleted a record or document; (2) he "acted with the intent to impede, obstruct, or influence an actual or contemplated investigation"; and (3) "the investigation concerned a matter within the jurisdiction of the U.S. Department of Justice or the Federal Bureau of Investigation." *United States v. Gonzalez*, 906 F.3d 784, 793 (9th Cir. 2018). The Government did not need to show that Defendant knew about a pending federal investigation. *Id.* at 794. As the Court previously ruled, the Government proved a submissible case. It presented evidence that Defendant selectively deleted all traces of Messrs. Mahoney and Harris from his phone, and that Defendant was aware that law enforcement was attempting to contact him for an hour before he turned over his phone. The Government also proved that the data was deleted between March 17, 2022 and March 23, 2022. A reasonable jury could infer that Defendant deleted information relating to the steroid distribution scheme after learning of the investigation.

Defendant argues that the jury instructions improperly reduced the burden of proof for the Government, particularly with regard to Defendant's knowledge of a pending investigation. Defendant specifically objects to the following instruction:

> The government is not required to prove that the defendant knew about a pending federal investigation or intended to obstruct a specific federal investigation, but the government is required to prove beyond a reasonable doubt that the matter or investigation at issue was within the federal government's jurisdiction.

(Final Jury Instructions, at 24:14-17.) This language was approved by the Ninth Circuit in *Gonzalez*, 906 F.3d at 794, and does not improperly lower the Government's burden to prove the elements of the offense. The Government did not need to prove that Defendant was aware of a specific federal investigation.

Even though knowledge of an actual investigation was not required to sustain a conviction, the Government did in fact prove that Defendant knew the FBI was seeking to investigate his phone. SA Wilson testified that she contacted Defendant via phone, told him the FBI was present with a warrant, and instructed him to exit his residence with his cell phone. (Trial Tr., Vol. I, at 390.) SA Wilson first spoke to Defendant around 8:00 a.m. (*Id.*) Defendant did not meet with the investigators until approximately 9:00 a.m., during which he had the opportunity to delete

1    communications and references to Messrs. Harris and Mahoney.  (Trial Tr., Vol. II, at 407.)  The

2    jury reasonably credited SA Wilson's testimony.

3           Defendant contends that the evidence cannot be sufficient to sustain a conviction because

4    the investigators possessed and manipulated the cell phone for more than an hour before it was

5    imaged, and because the investigators did not request Defendant's iCloud data from March 22,

6    2022 to compare against the March 23, 2022 phone contents.  Defendant argues that there is no

7    way to know beyond a reasonable doubt that he, not the investigators, deleted the references to

8    Messrs. Harris and Mahoney, or that he did so after learning of the investigation.  These objections

9    go to the weight of the evidence.  The jury, not the Court, weighs evidence and determines which

10   witnesses to believe.  *Johnson*, 251 F.3d at 1227.  Defendant made these arguments to the jury,

11   and the jury nevertheless reasonably determined that, beyond a reasonable doubt, Defendant

12   deleted the data to conceal the steroid scheme.  (*See* Trial Tr., Vol. III, at 591-594 (arguing that

13   jury should question lack of iCloud data and manipulation of phone by agents).)

14          Defendant argues that the Government elicited false testimony regarding the deletion of the

15   8:16 a.m. Signal message from Randy Gregg in order to create the appearance that Defendant

16   deleted evidence from his phone.  Defendant contends that this testimony must have been false

17   because all Signal messages on Defendant's phone were set to auto-delete.  Defendant's

18   contention is not supported by the evidence.  SA Cabrera testified that Defendant's Signal

19   application did not have a universal deletion timer.  (*Id.* at 418.)  She testified that five group

20   conversations within Signal had active deletion timers: "freedom coalition chat," "firearms team,"

21   "red swings," "gai boys," and "blue swings."  (*Id.* at 420.)  DAI Holcombe testified that the

22   message from Randy Gregg was sent to a chat entitled "operators."  (*Id.* at 493-494.)  "Operators"

23   is not one of the chats identified by SA Cabrera as having an automatic deletion timer.  DAI

24   Holcombe reasonably opined that a user deleted the message.

25          Defendant also argues that this testimony was false because DAI Holcombe improperly

26   adjusted the time from Universal Coordinated Time (UTC) to Pacific Daylight Time (PDT).

27   Defendant did not question DAI Holcombe regarding this conversion during trial.  In any event,

28   the Government's conversion of time is accurate.  A message sent at 3:16 p.m. UTC on March 23,

24

1   2022 would have been sent at 8:16 a.m. PDT because UTC is seven hours ahead of PDT.

2   　　　　Finally, Defendant argues that the Government failed to disclose DAI Holcombe's

3   opinions that the Gregg message was deleted, that contact information for Messrs. Harris and

4   Mahoney was deleted, or that the Venmo contact for Mr. Harris was deleted. Defendant did not

5   object during trial. (Dkt. No. 217, Mot., at 3 n.3; Hr'g Tr., at 23:5-11 ("[by the Court] Did you

6   make any objection or move to strike the testimony or ask for a limiting instruction? [by Ms.

7   Young] No.").) In response, the Government provides three Rule 16 notices for DAI Holcombe.

8   (Dkt. No. 222-1, Sargent Decl., Exs. 2-3, Supp. Rule 16 Notices.) The Rule 16 notices state, in

9   relevant part:

10  　　　SI Holcombe is expected to testify that, based on data recovered from forensic
    tools Axiom and Cellebrite, the contents of Exhibit 61 (US-SC-000551– US-
11  SC-000568), Exhibit 62 (US-SC-000522–US-SC-000550), Exhibit 63 (US-SC-
    000569– US-SC-000663), Exhibit 64 (US-SC-000439 – US-SC-000509),
12  Exhibit 65 (US-SC-000435– US-SC-000438), and Exhibit 66 (US-SC-000432–
    US-SC-000434) had been deleted from Wenger's cellular phone prior to
13  forensic extraction. SI Holcombe is also expected to testify that the deletions of
    the text messages contained in Exhibits 61, 62, 63, and 64 took place relatively
14  close in time to March 23, 2022 . . . . (Supp. Rule 16 Notice, at 2.)

15  　　　SI Holcombe is expected to testify that the contents of Exhibit 69 (US-SC-
    000706 – US-SC-000773) depict Cellebrite's recovery of device notifications
16  created by the application Signal, and that the contents of Exhibit 70 (US-SC-
    000774–US-SC-000943) depict Axiom's recovery of file system events
17  associated with Signal on March 23, 2022. . . SI Holcombe is also expected to
    testify that he was not able to recover any Signal messages that were sent or
18  received by Wenger's Apple iPhone 12 following January 1, 2022. . . . (*Id.*)

19  　　　SI Holcombe is also expected to testify that he was not able to retrieve certain
    Signal messages from Wenger's Apple iPhone 12 for which he was able to
20  recover device notifications for Signal messages from the device's file system,
    including multiple messages received on March 23, 2022, indicating that those
21  messages had been deleted from the Signal application. (*Id.*, Ex. 3, Second
    Supp. Rule 16 Notice.)
22

23  The disclosure provided notice that DAI Holcombe would testify the referenced exhibits had been

24  deleted from Defendant's cell phone data. Exhibit 65 is a report of contacts deleted from

25  Defendant's phone, which includes contact information for Messrs. Mahoney and Harris. (Dkt.

26  No. 212-27, Ex. 65.) Exhibit 65 also shows that Mr. Harris was deleted as a "friend" from

27  Defendant's Venmo account. (*Id.* at EX065-0002.) Exhibit 69 depicts extracted notifications

28  from Defendant's Signal chats, including the "operators" group chat. (Dkt. No. 212-30, Ex. 69.)

The latest notification is from "Randy Gragg" to "operators" at 3:16:40 UTC on March 23, 2022. (*Id.* at EX069-0001.)  The exhibits are not overly lengthy or confusing; the nature of each is readily apparent from a cursory review.  This disclosure is consistent with DAI Holcombe's testimony at trial.  (*See* Trial Tr. Vol. II, at 448-450, 472-473, 487, 489-494.)

Defendant contends that the disclosures were insufficient under Rule 16, and that the disclosures put the burden on Defendant to "figure out" what specifically DAI Holcombe would testify Defendant had deleted.  (Hr'g Tr., at 21:14-15.)  The Court asked Defendant to provide his best authority for his contention that the above language did not sufficiently disclose the content of DAI Holcombe's testimony.  (Notice of Questions for Hr'g, No. 3.)  Defendant submitted *United States v. Briscoe*, 703 F. Supp. 3d 1288 (D.N.M. 2023), which does not support his argument.  In *Briscoe*, the court found a Rule 16 disclosure to be sufficient where the disclosure stated the expert's conclusion and not his methodology.  *Id.* at 1295-96.  The court held that "the government's Notice, although it was not as specific as it could have been, substantially complied with Rule 16[.]"  *Id.* at 1296.  Here, the disclosure was at least as specific as the disclosure in *Briscoe*: it provided notice of DAI Holcombe's conclusions that Defendant had deleted the March 23, 2022 Signal message and that he had deleted the contents of the exhibits.  The Government could have spelled out the exact contents of the exhibits, but the contents were readily discernable from the documents themselves, and the documents were not inordinately lengthy or difficult to decipher.  The Government met its burden of disclosure.

In sum, the Government submitted sufficient evidence for a rational jury to find Defendant guilty of both counts beyond a reasonable doubt.

**B.      Motion for New Trial.**

Defendant moves in the alternative for a new trial on the basis of "irregularities in the handling of the jury and its verdict."  (Mot., at 9:8-9.)  Defendant contends that a new trial is also appropriate because the Government manipulated evidence and elicited false testimony.

**1.      Applicable Legal Standards.**

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

R. Crim. P. 33(a).  When weighing whether to grant a motion for a new trial, a district court does not need to view the evidence in the light most favorable to the verdict, but may instead weigh the evidence for itself.  *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  "The decision is within the sound discretion of the district court."  *Id.* at 1212 (marks and citation omitted).

### 2.    Defendant Does Not Identify Any Improper Contacts Between the Court and the Jury.

The Court previously understood Defendant's motion to allege that the Court had tampered with the jury verdict through a discussion with the jury before the verdict was announced.  At oral argument, counsel for Defendant stated that issues with the jury verdict were not inappropriate contacts between the Court and the jury, but rather the procedures by which the Court received the verdict.  (Hr'g Tr., at 8:8-13 ("And this is where I think we're taking a slightly different view.  The Court focused on the issue of improper contacts between the judge and jury, and that's not really the sum total of the issue.  The issue is really about the breakdown of procedure and how things were handled in violation of my client's rights.").)  The Court nevertheless feels constrained due to the gravity of the allegations of jury contact or tampering to address them.

"[D]ue process does not tolerate 'any ground of suspicion that the administration of justice has been interfered with' by external influence."  *Godoy v. Spearman*, 861 F.3d 956, 959 (9th Cir. 2017) (quoting *Mattox v. United States*, 146 U.S. 140, 149 (1892)).  "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."  *Mattox*, 146 U.S. at 150.  "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."  *Smith v. Phillips*, 455 U.S. 209, 215 (1982).  An inquiry into prejudice is not required if the alleged contact or communication is unsubstantiated.  *Tarango v. McDaniel*, 837 F.3d 936, 948 n.9 (9th Cir. 2016); *see also United States v. Decoud*, 456 F.3d 996, 1019-20 (9th Cir. 2006) (finding unsubstantiated allegations of juror prejudice did not merit evidentiary hearing).

Once a defendant has proven a juror contact with an external influence occurred, courts within the Ninth Circuit evaluate the contact under a two-step framework.  "At step one, the court

United States District Court
Northern District of California

asks whether the contact was 'possibly prejudicial,' meaning it had a 'tendency' to be 'injurious to the defendant.'" *Godoy*, 861 F.3d at 959 (quoting *Mattox*, 146 U.S. at 150). If the answer is yes, the Court presumes prejudice. *Id.* The Court then proceeds to step two, at which the Government faces a "heavy" burden to demonstrate that the contact was not, in fact, prejudicial. *Id.* If the Government cannot meet this burden, the Court must grant a new trial. *Id.* If "the prejudicial effect of the contact is unclear from the existing record, the trial court must hold a 'hearing' to 'determine the circumstances of the contact, the impact thereof upon the juror, and whether or not it was prejudicial.'" *Id.* (quoting *Remmer v. United States*, 347 U.S. 227, 229-30 (1954)).

Here, Defendant has not made overt allegations that an improper contact occurred between the Court and the jury, and he has not substantiated his implied allegations. Defendant contends that the following "irregularities" "tainted" the verdict: the Court obtained the verdict before the verdict was taken in open court in violation of Federal Rule of Criminal Procedure 31(a); the announcement of the jury verdict was delayed so that the jury could eat lunch; the jury was prematurely placed in the jury box after stating they had reached a verdict but before the Court was ready to resume, during which time jurors could have overheard conversation between Government attorneys and agents or press representatives; the courtroom deputies had a whispered conversation about the verdict; the bailiff assigned to the jury had a conversation with the court security officers; preparations were made to remand Defendant into custody before the verdict was announced; the jury's mood appeared angry and hostile when they were finally seated in the box; and the envelope containing the jury verdict was not sealed. All of these allegations, according to Defendant's moving papers, support an inference that the Court had an *ex parte* contact with the jury before the jury finalized the verdict. To the contrary, none do.

Rule 31(a) provides that the jury "must return its verdict to a judge in open court." Fed. R. Crim. P. 31(a). The rule does not state that the jury must place its verdict in a sealed envelope to be unsealed by the Court in front of all parties. Nor does the rule provide that the Court may not review the verdict before receiving it in open court. Defendant provides no authority to support his contention that receiving an unsealed verdict, or viewing the verdict before its receipt in the courtroom, amounts to an *ex parte* contact between the Court and the jury. Defendant did not

1    object to the manner in which the verdict was returned at the time it was returned.

2         The delay between the jury reaching its verdict and the pronouncement of the verdict was

3    likewise not prejudicial and does not indicate a contact between the Court and the jury.  The jury

4    handed its signed verdict form to the Courtroom Deputy when she delivered lunch to the

5    deliberation room.  The Court agreed that the jurors should be permitted to eat their lunches before

6    resuming proceedings, and it requested to meet with USMS during that time.  The less-than-one-

7    hour wait is that of a typical lunch break.

8         The premature placement of the jury in the jury box is wholly irrelevant to the question of

9    a prejudicial contact.  Defendant did not object at the time of the verdict to the jury's premature

10   placement in the box, did not ask the Court to poll the jury regarding anything they may have seen

11   or heard while they were in the box, and did not seek to conduct any discovery into the jury under

12   Federal Rule of Evidence 606.  If the jurors overheard or saw something in the courtroom from

13   federal agents or the press—which is purely speculative—no prejudice would have resulted

14   because the jury had already reached its verdict.  The jury received only one verdict form, which

15   its foreperson signed in pen.  There are no alterations or marks on the form which would indicate

16   any changes were made after the jury returned to the deliberation room.  (*See* Jury Verdict.)

17   Moreover, the Court instructed the jury on at least nine occasions, at length, that the jury was not

18   to consider any information in reaching its verdict other than the evidence received in the

19   courtroom.  (*See supra*, Background, Section C, Instructions Regarding Contact with the Jury.)

20   The jurors each signed certificates promising to abide by the Conduct of the Jury Instruction.  (*Id.*)

21   Jurors are presumed to follow the Court's instructions.  *See CSX Transp., Inc. v. Hensley*, 556 U.S.

22   838, 841 (2009) ("in all cases, juries are presumed to follow the court's instructions").

23        Likewise, the conversation between the courtroom deputies—assuming such a

24   conversation in fact happened—does not substantiate an allegation of improper contact between

25   the Court and the jury.  Defense counsel, Defendant, and Defendant's mother each have slightly

26   different recollections of this overheard conversation.  All agree that the courtroom deputies were

27   speaking to each other in a whisper, not to the parties.  The courtroom deputies' comments are

28   devoid of context and were heard from a distance, with protective glass between their desk and the

1   defense table.  The comments were made at least thirty minutes after the jury told the Courtroom

2   Deputy that it had reached a verdict and had filled out the verdict form.  Defendant did not object

3   to the Court at the taking of the verdict regarding this alleged conversation, did not inform the

4   Court that such a conversation had occurred until he filed the instant motion, and did not seek to

5   speak to court staff to determine what occurred.

6          The Court's request to speak with USMS upon learning of the guilty verdict also came

7   after the jury had reached its decision, and thus has no logical connection to the alleged improper

8   contact with the jury.  Defendant did not object to the Court speaking to USMS and did not inform

9   the Court at the taking of the verdict that USMS officers had been present.

10         Finally, Defendant's observation of the jury's alleged change in demeanor does not support

11   an allegation of improper contact.  Defendant did not object at the time of the verdict to the jury's

12   demeanor, did not ask the Court to poll the jury regarding their alleged change in attitude, and did

13   not seek to conduct any discovery into the jury under Federal Rule of Evidence 606.  (Hr'g Tr., at

14   12:25-14:16.)  The jurors could have exhibited a change in demeanor for any number of reasons.

15   The Court need not speculate.

16         At oral argument, the Court asked defense counsel to explain what evidence might be

17   adduced at an evidentiary hearing.  (*Id.* at 16:16-18.)  Defense counsel responded she would like

18   to examine the courtroom deputies and the courtroom security officer about what occurred in the

19   hour leading up to the reading of the verdict, but she had made no inquiries to determine what

20   transpired.  (*Id.* at 16:19-17:1.)  Counsel completed no steps whatsoever to investigate the

21   proceedings.  (Hr'g Tr., 14:8-16 ("[by the Court] The question is – I didn't ask – what steps did

22   you take?  Those steps could have included – first of all, the jury is not precluded from talking to

23   counsel.  Secondly, you could have requested, if you felt there was something wrong that was

24   going on, permission to talk to the jury.  You could have inquired of the Court for a ruling, or you

25   could have asked the Court to have testimony from, for example, court staff or the courtroom

26   security officers.  Did you do any of that?  [by Ms. Young] No."); *id.* at 15:14-16 ("[by the Court]

27   [D]id counsel for either side make any attempt to contact jurors to see if an improper influence

28   occurred?  [by Ms. Young] No.").)  The Court finds the aspersions wholly unsubstantiated and the

30

1    request for a hearing unsupported.

2        Defendant's own authorities underscore that an evidentiary hearing is unnecessary.  In

3    *United States v. McKinney*, 429 F.2d 1019, 1021 (5th Cir. 1970), defense counsel interviewed a

4    juror who claimed the jury had been exposed to newspaper articles about the defendant and that

5    the jury considered those articles during deliberations.  *Id.*  Counsel identified the juror by name

6    and address to the court.  *Id.*  In *Godoy*, the defendant brought an alternate juror to court to testify

7    regarding improper influences and later submitted a sworn declaration by the alternate juror.  861

8    F.3d at 960.  In *Remmer*, defense counsel provided newspaper articles and sworn affidavits

9    regarding an ex parte communication which occurred prior to deliberations.  347 U.S. at 228-29.

10   Here, in contrast, Defendant has provided no information which would support an inference that a

11   juror was exposed to an outside influence before the verdict was rendered.  Defendant has not

12   provided any authorities where a hearing was required to investigate allegations of improper

13   contacts with the jury which were purely speculative or unsupported.

14       In the absence of a substantiated allegation of juror contact, the Court does not proceed to

15   the two-step inquiry enunciated in *Godoy*.  *See Godoy*, 861 F.3d at 959 (setting forth inquiry);

16   *Tarango*, 837 F.3d at 948 n.9 (holding that, if the trial court determined no contact occurred, it

17   would not "have had any cause to inquire into prejudice").

18       **3.    Defendant Was Not Prejudiced by Any "Irregularities."**

19       Without a substantiated allegation of an improper contact between the Court and the jury,

20   lesser scrutiny applies.  In "run-of-the-mill ex parte contact case[s]" such as this one, Defendant

21   bears the burden of demonstrating prejudice.  *See United States v. Dutkel*, 192 F.3d 893, 896 (9th

22   Cir. 1999) (noting "prosaic kinds of jury misconduct" do not invoke the "categorical directive of

23   *Remmer*").  Defendant's allegation of "irregularities" comes down to his gestalt that, because his

24   verdict was slightly delayed and the Court reviewed the verdict in advance, he must have been

25   prejudiced.  Defendant does not articulate *how* he may have been prejudiced, and he does not point

26   to any authority suggesting that a new trial is warranted under these circumstances.

27       As discussed above, Defendant provides no authority for his position that the Court

28   reviewing the verdict prior to receiving it in open court constitutes a violation of Rule 31(a).  At

United States District Court
Northern District of California

oral argument, Defendant took a different tack: he argued that the Court's review deprived Defendant of his right to be present at all "critical stages" of the proceedings. (Hr'g Tr., at 10:2-19.) The Court disagrees. "A verdict is returned when it is given by the jury to the judge in open court." *United States v. Boone*, 951 F.2d 1526, 1532 (9th Cir. 1991). "[A] jury has not reached a valid verdict until deliberations are over, the result is announced in open court, and no dissent by a juror is registered." *United States v. Nelson*, 692 F.2d 83, 83 (9th Cir. 1982) (quoting *United States v. Taylor*, 507 F.2d 166, 168 (5th Cir. 1975), *superseded on other grounds as stated in United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992)). Defendant was present when the jury "returned" the verdict to the Court. *See Boone*, 951 F.2d at 1532 (holding defendant was present for return of verdict where court misread verdict in open court and finding written contradictory verdict form controlled); *see also Woollomes v. Heinze*, 198 F.2d 577, 579 (9th Cir. 1952) ("The judgment as uttered is the sole embodiment of the jury's act.").

Further, the Court acted for Defendant's benefit. Because the jury voted to convict Defendant on the Conspiracy charge, the Court was obligated under 18 U.S.C. sections 3143(a)(2) and 3145 to immediately remand Defendant into custody unless Defendant could show, by clear and convincing evidence, that he is not a flight risk or a danger to the community and that exceptional circumstances exist. The Court was concerned for Defendant's safety given Defendant's former employment in law enforcement. While Defendant had to wait for less than one hour while the Court waited to speak with USMS, the delay inured to Defendant's benefit. The Court determined that immediate remand would risk Defendant's safety, and it permitted Defendant to remain at liberty. (Trial Tr., Vol. III, at 623:24-624:5.) The Court's inquiry in no way prejudiced Defendant.

Defendant has further failed to articulate any way in which he was prejudiced by any conduct of the courtroom deputies. He has not provided, and the Court is unaware of, any authority to support the proposition that premature placement of the jury amounts to a breakdown in process, much less one that interferes with his substantial rights. The premature placement of the jury in the box had no effect on the final verdict or Defendant's rights. Defendant did not raise the issue at the time the verdict was returned, and he has not posited any theory by which the

1    mistake could have impacted the verdict.

2    Defendant has not shown that any of his allegations, separately or in combination, if true

3    would require a new trial.  (*See* Hr'g Tr., at 9:15-10:12 ("[by the Court] Do you have any authority

4    that tells me that if those things are true, the way the verdict was handled, that they constitute

5    reversible error or grounds for a mistrial?  Do you have any law on that?  [by Ms. Young] No, not

6    specifically. . . .)  None of the alleged missteps had any bearing on the trial process, deliberations,

7    or ultimate verdict.  Defendant's view "would elevate form over substance" and "frustrate the

8    jury's intent and the entire jury process."  *See Boone*, 951 F.2d at 1532.  Defendant has not

9    demonstrated prejudice and is not entitled to a new trial on this basis.

10    **4.    Defendant Fails to Show New Evidence.**

11    Defendant contends that the packaging information obtained by his mother via FOIA

12    request constitutes "new evidence" under Rule 33(b)(1).  To prevail on a Rule 33 motion based on

13    newly discovered evidence: "(1) the evidence must be newly discovered; (2) the failure to discover

14    the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the

15    evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor

16    merely impeaching; and (5) the evidence must indicate that a new trial would probably result in

17    acquittal."  *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005) (quoting *United States*

18    *v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991)).

19    Defendant cannot clear the first hurdle.  He possessed the FOIA documents prior to trial,

20    and thus they were not newly discovered after trial.  *See id.* (holding evidence obtained by counsel

21    during trial was not newly discovered).

22    Even if the evidence were newly discovered, Defendant cannot show that the evidence is

23    more than "merely impeaching."  *See id.*  Defendant argues that the purpose of the package was to

24    bolster the credibility of Mr. Harris.  The actual receipt or transport of the steroids is not an

25    element of the conspiracy conviction.  Raising doubts as to the weight of the package would thus

26    serve only to impeach the testimony of Mr. Harris.

27    Finally, Defendant has not shown that a new trial would probably result in acquittal.  Mr.

28    Harris's testimony was reinforced not only by the package, but also by the testimony of Mr.

Mahoney and the text messages between Mr. Harris and Defendant. Additional cross-examination regarding the weight of the package would not be likely to overcome the remaining evidence.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendant's motion for acquittal or, in the alternative, motion for new trial.

**IT IS SO ORDERED.**

Dated: July 16, 2025

JEFFREY S. WHITE
United States District Judge